SOUHERN PAC. CO. v. WESTERN PAC. RY. CO. et al.

WESTERN PAC. RY. CO. v. SOUTHERN PAC. CO. et al.

(Circuit Court, N. D. California.   March 19, 1906.)

No. 13,858.

1. COURTS—UNITED STATES COURTS—FOLLOWING STATE DECISIONS—OAKLAND
WATER FRONT—TITLE UNDER ORDINANCES AND BY DEED AND UNDER EXECU-
TION SALES AND REDEMPTION PROCEEDINGS—VALIDITY OF GRANT—RATIFICA-
TION, CONFIRMATION, AND COMPROMISE.

For the purpose of facilitating the construction of wharves and other
improvements on the Oakland water front, the state of California, by the
act of the Legislature of May 4, 1852 (St. 1852, p. 180, c. 107), incorporat-
ing the town of Oakland, granted to the town the state tide lands lying
within the corporate limits "between high tide and ship channel," known
as the "Water Front Lands." The town of Oakland, by ordinances and
by deed of conveyance, granted these lands to C., upon condition that the
grantee should construct certain wharves on the water front extending into
the deep water of the harbor, and that he should build a public schoolhouse
for the town.   C. constructed the wharves and built the public school-
house, as provided in the ordinances and deed, and subsequently supported
his title to the water front by deeds obtained in pursuance of execution
sales on judgments and redemption proceedings against the town with re-
spect to such property, and by a judgment of dismissal in his favor in a
suit brought against him by the city of Oakland.   The city of Oakland, the
municipal successor of the town of Oakland, denied the validity of the
grant made by the town of Oakland, and the claim of title thereto under
the execution sales and redemption proceedings and the judgment of dis-
missal, and instituted a number of suits to have the grant declared void.
In the last of these suits, commenced August 26, 1893, a judgment was en-
tered in the superior court of Alameda county in favor of the city.   On ap-
peal to the Supreme Court of the state that court was of the opinion that
it was within the power of the state to alienate those lands which are
covered and uncovered by the daily flux and reflux of the tide, but that a
transfer of the entire water front in bulk to a private citizen, without any
reservation of the right of access to the navigable waters by which the
town was almost completely surrounded, was a gross and evident excess of
power.   Oakland v. Oakland Water Front Co., 50 Pac. 277, 118 Cal. 160,
190.   The grant was therefore construed as limited in its extent by the
"southerly" line of the San Antonio creek or estuary" construed as being the
southerly line of low tide of that estuary, and the boundary by "ship chan-
nel" construed as the line of low tide on the bay front.   The grant as thus
limited was sustained—two judges holding that the grant of the tide lands
had been ratified and confirmed by the state in the act of May 15 1861 (St.
1861, p. 387, c. 360), three judges holding that under a compromise agree-
ment entered into by the city of Oakland on the 1st day of April, 1868,
with the claimants of the grant and the representatives of certain railroad
interests under the authority of an act of the Legislature of March 21, 1868
(St. 1867–68, p. 222, c. 230), all claims, demands, controversies, and causes
of action respecting said water front property had been effectually settled
and adjusted and that from and after the 2d day of April, 1868, the city
of Oakland ceased to be the owner, as trustee or otherwise, of any portion
of her water front except those portions secured to her by the compromise
of that date, and such streets, thoroughfares, and other parcels as may
have been previously dedicated to public use.   With respect to the claim
of title based upon the execution sales under judgments against the town
of Oakland the court held that the lands were held subject to a public
trust, and for that reason were not liable to levy and sale under execution,
and with respect to the judgment of dismissal, the action of the court did
not determine the validity of the grantee's title, and did not estop the city
of Oakland upon the question of title.

*Held:* (1) That whether the grant by the state to the town of Oakland and the transfer of such grant by the town of Oakland to a private individual were acts in excess of power, were questions of local law, which, having been determined by the Supreme Court of the state, the decision of that court will be followed by the United States Circuit Court.

(2) That whether the grant by the town of Oakland of its water front to an individual had been ratified, confirmed, or compromised by authority of law, and to what extent, if any, it had been ratified, confirmed, or compromised, were questions of local law, which, having been determined by the Supreme Court of the state, such decision will be followed by the United States Circuit Court.

(3) That the claim of title based upon execution sales and the claim of estoppel upon the judgment of dismissal were questions of local law, which, having been determined by the Supreme Court of the state, such decision will be followed by the United States Circuit Court.

[Ed. Note.—For cases in point, see vol. 13, Cent. Dig. Courts, §§ 950, 955, 958, 959, 965.

State laws as rules of decision in federal courts, see notes to Wilson v. Perrin, 11 C. C. A. 71 ; Hill v. Hite, 29 C. C. A. 553.]

2. SAME—OAKLAND WATER FRONT—SHIP CHANNEL.

The question, "What did the Legislature mean by the use of the term 'ship channel' in the grant of the lands 'lying between high tide and ship channel,'?" is a question of local law, which, having been determined by the Supreme Court of the state as comprising the waters left free to navigation, and the definite natural boundary of such navigable waters the line of low tide, the decision of that court will be followed by the United States Circuit Court.

3. SAME—BOUNDARIES OF THE GRANT.

The Supreme Court of the state having located the boundaries of the grant of the Oakland water front in determining the extent and validity of the grant, such boundaries will be followed by the Circuit Court in determining the conflicting claims of parties claiming title to lands upon such water front.

4. MUNICIPAL CORPORATIONS—OAKLAND WATER FRONT—LANDS BELOW THE LINE OF LOW TIDE.

The lands under the navigable waters of the Bay of San Francisco below the line of low tide, in front of the Oakland water front, belong to the state, and are not within the boundaries or under the jurisdiction of the town of Oakland as described in the freeholders' charter of 1889, and are therefore not subject to the provisions of such charter.

5. NAVIGABLE WATERS—LANDS UNDER WATER—OWNERSHIP AND CONTROL.

The lands under the navigable waters of the Bay of San Francisco below the line of low tide, in front of the Oakland water front, belong to the state, over which the owners of the shore land have right of access to the navigable waters of the bay, subject to the declared policy of the state as expressed in section 2 of article 15 of the Constitution of the state of 1879, relating to harbor frontage, etc., where it is provided that "no individual, partnership, or corporation, claiming or possessing the frontage or tidal lands of a harbor, bay, inlet, estuary, or other navigable water in this state shall be permitted to exclude the right of way to such water whenever it is required for any public purpose, nor to destroy or obstruct the free navigation of such water ; and the Legislature shall enact such laws as will give the most liberal construction to this provision, so that access to the navigable waters of this state shall be always attainable for the people thereof." The right is subject, also, to the power of the state to make such regulations and provide for such improvements as the public interests may require for the promotion of commerce and navigation.

6. SAME—DREDGING OPERATIONS UNDER THE AUTHORITY OF THE WAR DEPARTMENT.

Congress has the constitutional power to regulate and improve the harbors and navigable waters of the United States, and this power carries

144 F.—11

with it the right to deposit the material removed in making the improvements in any other part of the harbor or navigable waters or other place within its control.

(Syllabus by the Court.)

A. A. Moore (John Garber, P. F. Dunne, J. E. Foulds, and Stanley Moore, of counsel), for complainant Southern Pacific Co.

Warren Olney, Charles W. Slack, W. J. Bartnett, and Marcel E. Cerf (Joel F. Vaile, F. W. M. Cutcheon, and Garrett W. McEnerney, of counsel), for defendant Western Pacific Railway Co.

Warren Olney, for defendant American Dredging Co.

MORROW, Circuit Judge. The first of the above-entitled actions is a suit in equity brought by the complainant, the Southern Pacific Company, a corporation organized and existing under the laws of the state of Kentucky, against the Western Pacific Railway Company, a corporation organized and doing business under the laws of the state of California, and the American Dredging Company, a corporation also organized and doing business under the laws of the state of California, to restrain the defendants from filling up with sand, mud, or other material, and from occupying a certain described area of submerged and partly submerged tide lands of the Bay of San Francisco on the Oakland water front, claimed to be owned in fee simple by the complainant, and from the laying of railroad tracks and the construction of a railroad upon said lands, and from erecting wharves, piers, buildings, or constructions of any kind upon said lands. It is alleged that the acts of the defendants will cause complainant irreparable injury. Upon the verified bill of complaint, supported by affidavits, the court issued an order to show cause why an injunction pendente lite should not be granted as prayed for in the bill of complaint, and pending the hearing of the order to show cause, upon affidavits showing that unless the defendants were immediately restrained from the acts mentioned in the bill of complaint the complainant would suffer irreparable damage, a temporary restraining order was made part of the order to show cause. Before a hearing was had upon the order to show cause, the defendant Western Pacific Railway Company filed its cross-bill against the Southern Pacific Company, alleging that the Southern Pacific Company had no right, title, or interest in or to any of the submerged tide lands which the Western Pacific Railway Company and American Dredging Company were engaged in filling up as described in the bill of complaint, or to that being occupied by the Western Pacific Railway Company; that the possession and occupation of such lands by the Western Pacific Railway Company was in accordance with certain provisions of the laws of the state and the charter of the city of Oakland. It was further alleged by the Western Pacific Company, that the Southern Pacific Company had commenced the construction of a trestle upon lands occupied by said Southern Pacific Company, and was engaged in extending said trestle in the direction of the lands occupied by the Western Pacific Railway Company, and that the officers and agents of the said Southern Pacific Company who were in charge of the construction of said trestle gave out and declared that it was the intention of the said Southern Pacific Company to extend said

trestle to and onto the land occupied by the Western Pacific Railway Company, and take possession of the same for the purpose of said Southern Pacific Company; that the Western Pacific Railway Company believed that the Southern Pacific Company threatened and intended to, and unless prevented by the order and process of the court would, forcibly take possession of the said tract of land, with its tracks, shops, rolling stock, switches, and other terminal facilities, and would eject the Western Pacific Railway Company therefrom, to the irreparable damage and injury of the said Western Pacific Railway Company.

Upon the verified cross-complaint and affidavits in support thereof the court issued an order to the Southern Pacific Company to show cause why an injunction pendente lite should not issue, restraining and enjoining the Southern Pacific Company from doing or carrying out any of the acts threatened or intended to be carried out or done as threatened in the cross-complaint; and upon a showing of irreparable injury and damage to the Western Pacific Railway Company if the Southern Pacific Company were permitted to carry out its purposes pending the hearing upon the order to show cause, a temporary restraining order was made a part of the order to show cause. Upon the hearing of these orders to show cause voluminous records of judgments, public and private documents, legislative acts, municipal ordinances and proceedings, and numerous maps and charts of government surveys, and affidavits were introduced in evidence in support of the claims of the respective parties, showing that the title to the lands involved in this action have been the subject of controversy and extensive litigation for more than fifty years. For convenience of reference, and to assist in a better understanding of the questions involved in this controversy, a plat made under the direction of the court of a portion of the Oakland water front is hereto annexed.

The act of the Legislature of the state of California, approved February 18, 1850 (St. 1850, pp. 58-60, c. 15), subdivided the state into counties, and established seats of justice therein. Under this act the territory on the east side of the bay of San Francisco north of Alameda creek, was established as the county of Contra Costa. In 1852 the Legislature of the state passed an act declaring San Antonio creek, in the county of Contra Costa, navigable. The act provided as follows:

"The stream called San Antonio creek, in the county of Contra Costa, is declared navigable from its mouth to the old embarcadero of San Antonio, and no obstruction to the navigation thereof shall be permitted."

This act was approved May 3, 1852 (St. 1852, p. 182, c. 108). On the following day the town of Oakland was incorporated by an act of the Legislature approved May 4, 1852 (St. 1852, p. 180, c. 107). It was provided in section 1 of the act that the boundaries of the town should be as follows:

"On the northeast by a straight line, at right angles with Main street, running from the bay of San Francisco on the north to the southerly line of the San Antonio creek or estuary, crossing Main street at a point three hundred and sixty rods northeasterly from 'Oakland House,' on the corner of Main and First streets, as represented on Portoi's Map of 'Contra Costa,' on file in the office of the Secretary of State; thence down the southerly line of said creek

*or slough to its mouth in the bay; thence to ship channel; thence northerly and easterly by the line of ship channel to a point where the same bisects the said northeastern boundary line."*

## Section 3 (page 181) of the act provided:

"The board of trustees shall have power to make such by-laws and ordinances as they may deem proper and necessary; to regulate, improve, sell, or otherwise dispose of the common property; to prevent and extinguish fires; to lay out, make, open, widen, regulate, and keep in repair all streets, roads, bridges, ferries, public places and grounds, wharves, docks, piers, slips, sewers, wells and alleys, and to authorize the construction of the same, and with a view to facilitate the construction of wharves and other improvements, the lands lying within the limits aforesaid, *between high tide and ship channel* are hereby granted and released to said town; provided, that said lands shall be retained by said town as common property, or disposed of for the purposes aforesaid; to regulate and collect wharfage and dockage. * * *"

On May 18, 1852, the trustees of the town of Oakland passed an ordinance, entitled "An ordinance for the disposal of the water front belonging to the town of Oakland, and to provide for the construction of wharves." The ordinance is as follows:

"Section 1. The exclusive right and privilege of constructing wharves, piers and docks, at any points within the corporate limits of the town of Oakland, with the right of collecting wharfage and dockage at such rates as he may deem reasonable, is hereby granted and confirmed unto Horace W. Carpentier and his legal representatives, for the period of thirty-seven years; provided, that the said grantee or his representatives shall, within six months, provide a wharf at the foot of Main street at least twenty feet wide and extending toward deep water fifteen feet beyond the present wharf at the foot of said street; that he or they shall, within one year, construct a wharf at the foot of F street or G street, extending out to boat channel, and also within twenty months another wharf at the foot of D street or E street; provided, that two per cent. of the receipts for wharfage shall be payable to the town of Oakland.

"Sec. 2. With a view the more speedily to carry out the intentions and purposes of the act of the Legislature, passed May fourth, one thousand eight hundred and fifty-two, entitled 'An act to incorporate the town of Oakland, and to provide for the construction of wharves thereat,' in which certain property is granted and released to the town of Oakland to facilitate' the making of certain improvements; now, therefore, in consideration of the premises herein contained and of a certain obligation made by said Horace W. Carpentier with the town of Oakland, in which he undertakes to build for said town a public school-house, the water front of said town, that is to say, all the land lying within the limits of the town of Oakland, *between high tide and ship channel*, as described in said act, together with all the right, title and interest of the town of Oakland therein, is hereby sold, granted and released unto the said Horace W. Carpentier and to his assigns or legal representatives, with all the improvements, rights and interests thereunto belonging.

"Sec. 3. The president of the board of trustees is hereby charged with the duty of executing on behalf of the town of Oakland, a grant and conveyance in accordance with the provisions of this ordinance."

In pursuance of the provisions of the foregoing ordinance the president of the board of trustees, on May 31, 1852, executed and delivered to Horace W. Carpentier, the grantee, a deed, in the following terms:

"Know all men by these presents, that I, Amedee Marier, president of the board of trustees of the town of Oakland, in the county of Contra Costa, and state of California, in conformity to the provisions of an ordinance passed by said board of trustees, bearing date May 27, 1852, and entitled 'An ordinance for the disposal of the water front belonging to the town of Oakland and to provide for the construction of wharves,' and by virtue of the authority vested

in me as said president of the board of trustees by the Constitution and laws of the state of California, and especially by an act of the Legislature approved May 4, 1852, and entitled 'An act to incorporate the town of Oakland, and to provide for the construction of wharves thereat,' in my official capacity as said president, and in view of the public convenience, have granted unto Horace W. Carpentier and his legal representatives the exclusive right and privilege of constructing wharves, docks, and piers at any point or points within the now corporate limits of the town of Oakland, with the right of collecting wharfage and dockage, for the period of thirty-seven years, and in consideration of the covenant hereinafter mentioned, and of five dollars paid to the town of Oakland, the receipt whereof is hereby acknowledged, in obedience to the ordinance aforesaid, and by virtue of the authority as aforesaid vested in me as president of the board of trustees as aforesaid: Now, by virtue of said office, I have sold, and by these presents do sell, transfer, grant, and release, unto the said Horace W. Carpentier, and his legal representatives, all the right, title and interest of the said town of Oakland in and to the water front of said town; that is to say, all the land lying within the now corporate limits of the town of Oakland and situated *between high tide and ship channel*, as granted to said town by, and as described in the said above-entitled act. To have and to hold the same, *provided*, that the said Carpentier or his legal representatives shall, within six months, provide a wharf at the foot of Main street at least twenty feet wide and extending toward deep water fifteen feet beyond the present wharf at the foot of Main street; that he or they will, within one year, construct a wharf at the foot of F street or G street, extending out to boat channel, and also within eighteen months another wharf at the foot of D street or E street; and *provided*, also, that two per cent. of the receipts for wharfage shall be payable to the town of Oakland."

On January 1, 1853, the board of trustees passed an ordinance approving the wharf built by Horace W. Carpentier at the foot of Main street, and extended the time in which he was to construct a wharf at the foot of F street or G street for the period of 12 months from the expiration of the time limited and expressed in the ordinance of May 18, 1852, and the deed of conveyance and the time for building the wharf at the foot of D or E street was extended in like manner for the term of 8 months from its expiration. On July 12, 1853, Carpentier reported to the board of trustees that, in compliance with the grant to him of the Oakland water front, he had built a substantial, elegant, and commodious schoolhouse for said town, which was then completed and ready for delivery. On August 27, 1853, the board of trustees passed an ordinance providing as follows:

"Section 1. The wharf built by Horace W. Carpentier at the foot of G street, having been built within the time and in accordance with the provisions and stipulations of 'An ordinance for the disposal of the water front belonging to the town of Oakland, and to provide for the construction of wharves,' and of 'An ordinance to approve the wharf at the foot of Main street, and to extend the time for constructing the other wharves,' the same is hereby approved by the board.

"Sec. 2. The schoolhouse mentioned and described in the said first above-recited ordinance which the said Carpentier contracted to build, in part consideration for the water front of said town, as sold and conveyed to him in said ordinance, and by deed dated May 31, 1852, having been built and completed to the satisfaction of this board and according to the terms of said ordinance and contract, and the said schoolhouse having been delivered into the possession and occupancy of this town, it is hereby accepted and approved by the board.

"Sec. 3. The other wharf provided for and described in the said ordinances and deed may be built by the said grantee at the foot of Castro street or

Grove street, instead of at the foot of D street or E street as prescribed in said ordinances and deed.

"Sec. 4. The said ordinance entitled 'An ordinance for the disposal of the water front belonging to the town of Oakland, and to provide for the construction of wharves,' for the consideration therein set forth and expressed, and now, in chief satisfactorily paid and performed. and in consideration of the premises, is hereby ratified and confirmed, and the said water front of the town, as therein described is hereby granted, sold, and conveyed unto the said Carpentier and his legal representatives in fee simple forever, with the right to erect wharves, piers, docks and buildings at any and all points thereon, not obstructing navigation, and to freely use and occupy the lands herein conveyed."

The act of the Legislature passed March 25, 1853 (St. 1853, p. 56, c. 41), created the county of Alameda out of territory formerly within the boundaries of the counties of Santa Clara and Contra Costa. From the latter county was taken territory which included the town of Oakland and San Antonio creek. By the act of the Legislature passed March 25, 1854 (St. 1854, p. 183, c. 73), the town of Oakland was incorporated as the city of Oakland, with boundaries the same as the boundaries of the town of Oakland. Section 12 (page 187) of this act provided:

"The corporation created by this act shall succeed to all the legal and equitable rights, claims and privileges, and be subject to all the legal liabilities and obligations made bona fide of the town of Oakland; and the common council shall have full power to maintain suits in the proper courts to recover any right or interest or property which may have accrued to the town of Oakland."

On August 14, 1854, the mayor, Horace W. Carpentier, in a message to the common council, referred to the fact that under the act of. May 4, 1852, a wharf had been constructed at the foot of Broadway, a wharf at the foot of Webster street, and a third wharf at the foot of E street, then known as Washington street, had been completed.

The Legislature, on May 14, 1861 (St. 1861, p. 367, c. 360), passed an act amendatory and supplementary of the act of incorporation passed March 25, 1854, in which it was provided among other things, that (section 5, p. 369):

"The common council of the city of Oakland is hereby authorized and empowered to ratify and confirm any ordinance or resolution of the board of trustees of the late town of Oakland."

On May 15, 1861 (St. 1861, p. 384, c. 377), the Legislature passed an act to amend the act to incorporate the city of Oakland, passed March 25, 1854. Among the amendments was one relating to the boundaries of the city, which the amendment more particularly defined and described as follows:

"Northerly by a straight line drawn at right angles with Broadway, formerly Main street, in said city, crossing the extended line of Broadway at a point three hundred and sixty rods northerly from where formerly stood the 'Oakland House,' on the northwest corner of Broadway and First street, and *running from the Bay of San Francisco on the west* to the easterly, or southeasterly, line of that branch of the San Antonio slough, or estuary, over which crosses the bridge from Oakland to Clinton; thence along the eastern and southern *high tide line* of said slough and of the estuary of San Antonio, following all the meanderings thereof to the mouth of said estuary, *in the*

*Bay of San Francisco;* thence southwesterly to ship channel; *thence northerly along the line of ship channel* to a point where the same intersects the said northern boundary line extended westwardly."

Section 12 of the act of March 25, 1854, was amended as follows:

"The corporation created by this act shall succeed to all the legal and equitable rights, claims, and privileges, and be subject to all the legal, or equitable, liabilities and obligations of the town of Oakland; *and the ordinances of the board of trustees of said town are hereby ratified and confirmed,* and the common council shall have power to maintain suits in the proper courts to recover any right, or interest, or property, which may have accrued to the town of Oakland."

By the act of the Legislature passed April 24, 1862 (St. 1862, p. 337, c. 294), the city of Oakland was reincorporated, with boundaries the same as the previous town of Oakland, but again more particularly described as follows:

"Northerly by a straight line drawn at right angles with Broadway, formerly Main street, in said city, crossing the extended line of Broadway at a point three hundred and sixty rods northerly from where stood the 'Oakland House,' on the northwest corner of Broadway and First streets, *and running from the Bay of San Francisco, on the west,* to the easterly or southeasterly line of that branch of the San Antonio slough, or estuary, over which crosses the bridge from Oakland to Clinton; thence along the eastern and southern highest tide line of said slough, and of the estuary of San Antonio, following all the meanderings thereof to the *mouth of said estuary, in the Bay of San Francisco;* thence southwesterly to ship channel; *thence northerly along the line of ship channel* to a point where the same intersects the said northern boundary line extending westward."

Section 58 (page 354) of this act repealed the act of March 25, 1854, incorporating the city of Oakland, the amendatory and supplementary act of May 14, 1861, the amendatory act of May 15, 1861, and all other acts in conflict with the act; *"provided, that the validity of the ordinances or proceedings of the trustees of the town of Oakland, and of the authorities of the city of Oakland, shall in no wise be affected thereby."*

On March 21, 1868, the Legislature passed an act entitled "An act to enable the city of Oakland to settle its controversies." The act provided that:

"The council of the city of Oakland, with the concurrence of the mayor of said city, is hereby authorized and empowered to compromise, settle and adjust any and all claims, demands, controversies and causes of action in which the said city is interested." St. 1867-68, p. 222, c. 230.

On the 28th day of March, 1868, the Oakland Water Front Company filed in the county clerk's office of Alameda county its articles of incorporation, in which it was certified that the amount of the capital stock of said company was to be $5,000,000, and should consist of 50,000 shares of $100 each. At the first meeting of the company, held on April 1, 1868, the entire capital stock of the company was subscribed for, as follows: H. W. Carpentier, 23,000 shares; E. R. Carpentier, 2,000 shares; Leland Stanford, 17,500 shares; John B. Felton, 4,999 shares; Samuel Merritt, 1 share; Lloyd Tevis, 2,500 shares. In carrying into effect the compromise authorized by the act of March 21, 1868, Horace W. Carpentier, on March 31, 1868, executed a deed of conveyance of

the greater part of the water front of Oakland to the Oakland Water Front Company. The deed described the premises as follows:

"All of the water front of the city of Oakland, that is to say, all the lands and the lands covered with water lying within the limits of said city *between high tide mark and ship channel,* being the water front lands within the boundaries described and granted in and defined by the act entitled 'An act to incorporate the town of Oakland and to provide for the construction of wharves thereat,' approved May 4, 1852, and the act entitled 'An act to amend an act entitled "An act to incorporate the city of Oakland," passed March twenty-fifth, eighteen hundred and fifty-four, and repealing certain other acts in relation to said city,' approved April 24th, 1862, together with all the privileges and appurtenances, rights, and franchises thereunto appertaining and belonging, together with all rights to collect tolls, wharfage, and dockage thereon and therefrom, and all lands, rights, privileges, and franchises of every kind and nature which have been heretofore acquired by the said party of the first part from the town of Oakland and the city of Oakland, or either of them, and all rights to the above-mentioned land, franchises, and privileges which he may hereafter acquire from the said city of Oakland; excepting therefrom, however, so much of the said water front as lies between the middle of Washington street and the middle of Franklin street, and extending southerly to a line parallel to First street, and two hundred feet southerly from the present wharf, according to the map of the city of Oakland, with the right of wharfage, dockage, and tolls thereon."

In further execution of the compromise the parties in interest entered into the following agreement:

"This indenture, made the first day of April, 1868, between the Oakland Water Front Company, party of the first part, the Western Pacific Railroad, Company, party of the second part, the City of Oakland, party of the third part, Horace W. Carpentier, party of the fourth part, John B. Felton, party of the fifth part, and Leland Stanford, party of the sixth part:

"Whereas, the said Horace W. Carpentier, by deed bearing date of March 31st, 1868, conveyed to the said Oakland Water Front Company the water front of the City of Oakland and certain rights, privileges, and franchises, as by reference to said deed will more fully appear:

"And whereas, the said deed was executed and delivered to the said Oakland Water Front Company, upon the express trusts, and subject to the covenants and agreements herein set forth:

"Now, know all men by these presents that the said Oakland Water Front Company, in consideration of said conveyance and the said premises, and in further consideration of the sum of one dollar, to it paid by the other parties herein named, the receipt whereof is hereby acknowledged, doth hereby declare and make known that it holds the said premises conveyed by the said deed upon the following express trust, and subject to the following covenants and agreements, to wit:

"First. The said Western Pacific Railroad Company shall, with all reasonable diligence, and within three months from this date, select from and locate upon the premises described in said deed, five hundred acres thereof, in one or two parcels, in the form of squares or parallelograms, with right, acute, or obtuse angles, but not so as to include an aggregate frontage on ship channel exceeding one-half mile in length; also to select and locate within said time, over the remainder of said premises, not exceeding two strips of land, each strip to be not more than one hundred feet wide at grade, for the track or tracks of its railroad, from high-water mark to such parcel or parcels, and between the same; and the said Oakland Water Front Company hereby covenants and agrees with the said party of the second part, that it will, at any time after such selection and location shall be made, upon demand, convey by proper conveyance or conveyances, the said five hundred acres, and the exclusive right of way over the said strips of land thus selected and located, to the said party of the second part, which conveyance or conveyances shall contain a covenant or agreement, that if the said parcels, or either of them, shall be located out to a westerly *water front of twenty-four feet depth of water at low tide, no*

*land shall be sold westerly thereform, and no obstruction or impediment shall ever be placed or put in front, or westerly of the same or anything done to prevent the free and unobstructed approach and access of vessels to said parcels.*

"Second. And the said party of the first part hereby further covenants and agrees that it shall and will, upon demand, convey to the city of Oakland so much of the said premises as lies between the middle of Franklin street and the easterly line of Webster street, and extending out to a line parallel with First street, and two hundred feet southerly of the present wharf at the foot of Broadway, in the city of Oakland, according to the map of said city, with the right of wharfage, dockage, and tolls thereon. And said party of the first part further covenants and agrees that it will, within a reasonable time, designate and dedicate as a navigable water course for public use, the channel of San Antonio creek, *from ship channel to the town of San Antonio*, to a width of not less than two hundred feet over the *shallow water at the bar*, and three hundred feet wide above that place, subject to and reserving the right, however, to build bridges across said channel with suitable draws."

The third covenant and agreement provided that the Oakland Water Front Company would issue to Horace W. Carpentier 25,000 shares of its capital stock, to John B. Felton 5,000 shares of its capital stock, and to Leland Stanford 20,000 shares of its capital stock. The fourth and last covenant and agreement provided that the Oakland Water Front Company authorized the city of Oakland or other parties to construct a dam above the Oakland bridge across the estuary of San Antonio, which lies between Oakland and Clinton, so as to retain the water and keep the land above submerged to high tide mark, for the use of the owners of the adjoining lands and the public. In further execution of the compromise the following agreement was executed by the parties thereto:

"Articles of agreement made this first day of April, 1868, between the Western Pacific Railroad Company, party of the first part, Leland Stanford, party of the second part, and the Oakland Water Front Company, party of the third part:

"Whereas, Horace W. Carpentier has, by deed bearing date of March 31st, 1868, conveyed the water front of the city of Oakland, and certain rights, privileges, and franchises to the said party of the third part;

"And, whereas, the said party of the third part has executed and delivered to the said party of the first part bearing even date herewith, an agreement to convey certain portions of said premises to the said party of the first part which deed and agreement are hereby referred to for greater certainty:

"Now, the said party of the first part hereby covenants and agrees, in consideration of such conveyance of said premises, that, upon such conveyance or conveyances being made, so as to vest a good title in fee simple in said premises in said party of the first part, and upon the performance and execution by the municipal authorities of the city of Oakland of all instruments, ordinances, acts, and proceedings necessary to perfect, complete and make good the title to said premises described in said deed from the said Carpentier to the said Oakland Water Front Company, and which is to be done within a reasonable time from this date, it will, within eighteen months thereafter, and with reasonable despatch, proceed and construct, or purchase and complete a railroad connection from its main line to the said parcel or parcels thus selected by it, or one of them, and will, within said time, complete such connecting railroad thereto, and, further, will erect and construct on said selected parcels, or one of them, the necessary buildings and structures for a passenger and freight depot, for the use of its railroad, expending upon the said premises, within three years, not less than five hundred thousand dollars in gold coin, but not including therein the purchase of existing improvements thereon. And if the said party of the first part shall fail, neglect, and refuse to provide such connecting railroad, and to make such depot buildings, and expend the said sum of money, within the said three years, the said five hundred acres thus conveyed shall be forfeited, and the same shall be conveyed by said party of the first part to the city of Oakland.

"And the said party of the first part further covenants and agrees that it will not convey to any person or corporation any portion of the said five hundred acres at any time within two years from this date.

"And the said party of the second part hereby covenants and agrees that the said party of the first part shall and will faithfully do and perform its said covenants and agreements herein set forth."

The last covenant of this agreement relates to the bridge across the estuary of San Antonio, and is not material to any question before the court. In further execution of the compromise the city council of the city of Oakland, on the 1st day of April, 1868, passed the following ordinance:

"An ordinance for the settlement of controversies and disputes concerning the water front of the city of Oakland, the franchises thereof, and other matters relating thereto.

"Section 1. The claims, demands, controversies, disputes, litigations and causes of action heretofore existing between the city of Oakland, on the one part, and Horace W. Carpentier and his assigns, of the other part, relating to the force, validity and effect of a certain ordinance, passed by the board of trustees of the town of Oakland on the 18th day of May, A. D. 1852, and enrolled May 27th, 1852, signed by A. Marier, president of the said board of trustees and F. K. Shattuck, clerk of said board, entitled 'An ordinance for the disposal of the water front belonging to the town of Oakland, and to provide for the construction of wharves,' wherein and whereby, for the considerations therein named, 'the water front of said town, that is to say, all the lands lying within the limits of the town of Oakland *between high tide and ship's channel,*' as described in the act of the Legislature for the incorporation of said town, passed May 4th, 1852, together with all the right, title and interest of said town therein, together with all the privileges, rights and franchises therein mentioned, were sold, granted and released to Horace W. Carpentier and his assigns. And also in relation to the validity, force and effect of a certain conveyance, executed and delivered to the said Carpentier, of the said water front, dated May 31st, 1852, by the said Amedee Marier, president of said board of trustees, under and in pursuance of said ordinance.

"And also in relation to the force, validity and effect of a certain other ordinance, passed by the board of trustees on the 30th day of December, A. D. 1852, entitled 'An ordinance to approve the wharf at the foot of Main street, and to extend the time for constructing the other wharves,' which said ordinance was enrolled January 1st, A. D. 1853, and signed by said president and clerk of the said board of trustees, wherein and whereby the said first-mentioned ordinance and the said deed of conveyance were recognized and approved.

"And also in relation to the force, validity and effect of a certain other ordinance entitled 'An ordinance concerning wharves and the water front,' passed on the 27th day of August, A. D. 1853, by said board of trustees, which said ordinance was enrolled, dated August 27th, A. D. 1853, and was signed by A. W. Burrell, president, and A. S. Hurlbutt, clerk of the said board of trustees, wherein and whereby the said first-mentioned ordinance was in all things ratified and confirmed, and the said water front again granted, sold and conveyed to the said Carpentier in fee simple forever, are hereby compromised, settled and adjusted, and the said above-mentioned ordinances and conveyance are made valid, binding and ratified and confirmed, and all disputes, litigations, controversies and claims in and to the franchises and property described in said ordinances and deed of conveyance and every part thereof are abandoned and released by the said city of Oakland to the said Carpentier and his assigns upon the following conditions, to wit:

"That the said Carpentier and his assigns shall convey by proper and sufficient deeds of conveyance all the property and franchises mentioned and described in said ordinances and deed of conveyance hereinbefore referred to, to the Oakland Water Front Company, to be used and applied in accordance with the terms, conditions, stipulations, and agreements contained in certain contracts between the said Oakland Water Front Company, and the Western Pacific

Railroad Company, and other parties bearing even date herewith, with the exceptions in the said agreement specified. But nothing herein contained shall be deemed to affect any rights of the San Francisco and Oakland Railroad Company, derived under an ordinance of the city of Oakland, passed the 20th day of November, 1861."

The foregoing ordinance was amended on April 2, 1868, as follows:

"Section 1. The third clause of section 1 shall be amended to read as follows: And also in relation to the force, validity and effect of a certain other ordinance, passed by the board of trustees, on the 30th day of December, 1852, entitled 'An ordinance to approve the wharf at the foot of Main street, and to extend the time for constructing the other wharves,' which said ordinance was enrolled January 1st, 1853, and signed by the said president and clerk of the said board of trustees, wherein and whereby the said first-mentioned ordinance and the said deed of conveyance were recognized and approved."

In further execution of the compromise the council of the city of Oakland, on April 2, 1868, passed the following ordinance:

"Section 1. It appearing to the satisfaction of the council that all the terms and conditions of a certain ordinance heretofore passed, entitled, 'An ordinance for the settlement of controversies and disputes concerning the water front of the city of Oakland, the franchises thereof, and other matters relating thereto,' have been fully satisfied and complied with by Horace W. Carpentier and his assigns, all the ordinances and deed therein mentioned and described are hereby finally ratified and confirmed, and all disputes, controversies, claims, demands and causes of action heretofore existing between the city of Oakland, on the one part, and Horace W. Carpentier and his assigns of the other part, relating to the force and validity of the said ordinances and deed are hereby abandoned and released by the said city of Oakland to the said Carpentier and his assigns: provided, that nothing herein contained shall release the right of the city of Oakland to the reversion of the property, franchises and rights released, as provided in the contract between the Western Pacific Railroad Company and the Oakland Water Front Company, in case said city of Oakland shall become entitled to the same under said contract."

In pursuance of the first covenant and agreement contained in the compromise agreement of April 1, 1868, the Western Pacific Railroad Company made its selection of five hundred acres of submerged lands and rights of way on the Oakland water front for terminal purposes, as in the compromise agreement provided, made the connection from the main line to the parcels selected, and constructed thereon the necessary buildings and structures for a passenger and freight depot for the use of the railroad, expending thereon and within the time provided in the agreement over $500,000 in gold coin; and on the 27th day of July, 1870, the Oakland Water Front Company conveyed by deed to the Western Pacific Railroad Company the title to such selected lands including a tract containing 319,626 acres, *which was located to a westerly water front of twenty-four feet depth of water at low tide.* This tract of land, with its structures, have since been known as the "Oakland Mole and Long Wharf." It appears that prior to this conveyance, and on the 23d day of June, 1870, the Western Pacific Railroad Company and the Central Pacific Railroad Company were consolidated as one corporation, and incorporated and organized as the Central Pacific Railroad Company, and that the conveyance by the Oakland Water Front Company to the Western Pacific Railroad Company on July 27, 1870, was a mistake, and should have been made to the consolidated Central Pacific Railroad Company. Accordingly, on the 6th day of November,

1879, this mistake was corrected, and a conveyance of the same described premises was made by the Oakland Water Front Company to the Central Pacific Railroad Company. On the 17th day of February, 1885, the Central Pacific Railroad Company leased to the Southern Pacific Company, the complainant in this case, for a period of 90 years, the railroads of the Central Pacific Company, together with its branches and leased lines, depots, station houses, equipments, and appurtenances of every kind and nature whatsoever to the said railroads, branches, and leased lines, respectively, belonging or appertaining. This lease was afterwards modified by amendments, but these amendments are not material to any question before the court.

We return, now, to an early period in the history of this title to the Oakland water front, to notice some of the other proceedings taken by Horace W. Carpentier to secure a title to the premises in controversy. In 1854 the town of Oakland, just prior to being incorporated as the city of Oakland, became indebted to its four policemen, Hugh Gainer, Henry Hoisington, D. C. Porter, and John Hill, for services rendered in pursuance of an ordinance passed by the board of trustees of the incorporation known as the *town* of Oakland. The policemen also rendered services to the *city* of Oakland under the same employment. They severally brought suit against the *city* of Oakland to recover the amount due for services rendered both corporations, and obtained judgments against the *city* of Oakland in the sum of $150 each. Upon these judgments executions were issued and levied by the sheriff on "all the water front of said city; that is to say, all the land lying within the limits of the now corporated city of Oakland, and *situated between high tide and ship channel,* as granted to the late town of Oakland." After the sale had been advertised as required by law, the property was sold by the sheriff on February 10, 1855, to F. K. Shattuck, for the sum of $13, subject to redemption. On November 10, 1854, John B. Watson brought suit against the city of Oakland, as assignee of 24 different warrants issued by the trustees of the town of Oakland on and between October 12, 1853, and March 1, 1854, and drawn upon the treasurer of the town in payment of certain claims against the town. On January 15, 1855, judgment in favor of the plaintiff and against the city of Oakland was entered for the sum of $7,333.18, and on March 3, 1855, Watson, in pursuance of law, redeemed from the sheriff's sale to Shattuck, and on April 24, 1856, the sheriff executed and delivered to Watson a conveyance of the property described as "all the right, title, claim and interest which the said defendant, the City of Oakland, had on the 10th day of February, 1855, or at any previous time subsequent to the 1st day of December, 1854, the date of the docketing of the said several judgments of the district court, of, in and to the following described property, commonly known as the 'water front' of the city of Oakland; that is to say, all the land and lands and water situated within the limits of said city and lying between the line of high tide and ship channel, being the same premises which were heretofore granted to the town of Oakland in and by the before-mentioned act of the Legislature." Act May 4, 1852. Subsequently, through various mesne conveyances, in which

members of the family of Horace W. Carpentier were parties, this title became vested in the Oakland Water Front Company.

On August 24, 1857, the city of Oakland brought a suit in equity in the district court of the Third judicial district against Horace W. Carpentier and Harriet N. Carpentier to set aside the ordinances and deeds under which the defendants claimed title to the franchises and real estate described in the act of May 4, 1852. It was alleged in the bill of complaint that the ordinances were illegal and void, and the deeds fraudulently obtained by the defendants. It was further charged that the ordinances and deeds were a cloud upon plaintiff's title to the premises, and embarrassed the city in the exercise of the legitimate franchises appertaining thereto. The court was accordingly asked to declare the ordinances and deeds null and void. The defendants demurred to the complaint on the grounds that it did not state facts sufficient to constitute a cause of action and was barred by the statute of limitations. The court sustained the demurrer, and the plaintiff appealed to the Supreme Court, where the judgment of the lower court was reversed and the cause remanded for further proceedings. 13 Cal. 540. In the court below the defendants answered. The case was transferred to the district court for the Twelfth judicial district. A supplemental answer was filed on October 1, 1861, claiming the benefit of section 12 of the act of the Legislature of May 15, 1861 (St. 1861, p. 387, c. 377), ratifying and confirming the ordinances of the board of trustees of the town of Oakland. To this supplemental answer the plaintiff filed a reply, charging that the act of the Legislature was passed at the instigation and fraudulent suggestion of the defendant Horace W. Carpentier, and denied that it was the intention of the Legislature to ratify and confirm the said ordinances. The case was tried by the court, and a decree entered in favor of the plaintiff. An appeal was thereupon taken to the Supreme Court, where it was held that the charges of fraud as a ground for equitable relief had been fully answered; that if the ordinances of the board of trustees of the town of Oakland granting the franchises and land to Carpentier were void, there was no occasion for the interference of equity; if they were only voidable, that interference cannot be invoked until equity is done by the party claiming it—that is, by placing or offering to place the party relying upon the acts of the agents of the town in the same position which he would have occupied, but for his reliance upon their validity. The judgment of the court below was accordingly reversed, and that court directed to dismiss the action. 21 Cal. 642, 666.

On February 19, 1880, the city of Oakland brought another suit against the Oakland Water Front Company, the Central Pacific Railroad Company, and a number of individuals, alleging that the defendants claimed some interest adversely to the plaintiff in the lands granted by the state to the town of Oakland under the act of May 4, 1852. The prayer of the complaint was that it be adjudged and determined that the defendants had no estate, interest, or title in or to said lands, or any part thereof, and that the defendants and each of them be decreed to abate and remove all obstructions and nuisances by them or either of them placed thereon; that the plaintiff held the said lands as the suc-

cessor of the state of California by a good and valid title, in trust for the use and benefit of the public. The defendants answered, and the defendant the Oakland Water Front Company filed a cross-bill, and thereafter, on February 7, 1882, the parties to the action entered into a written stipulation that the action be dismissed as to all the defendants except the Oakland Water Front Company. It was further stipulated that the Oakland Water Front Company should have a final judgment against the plaintiff, quieting its title to the land described in its cross-bill, and a judgment was entered accordingly. The judgment described the lands granted to the Town of Oakland by the act of May 4, 1852, and as they were described in that Act.

It appears that taxes for state and county purposes were assessed against the Oakland Water Front Company on its real property, commencing with the year 1868–69, and continuing down to and including the year 1893–94. These taxes were paid. Taxes were also assessed for city purposes against the Oakland Water Front Company on its real property, commencing with the year 1870–71, and continuing down to and including the year 1893–94. These taxes were also paid.

San Antonio creek, or estuary, is a tidal stream, not to exceed three miles in length from its mouth to the old embarcadero of San Antonio, as mentioned in the act of May 3, 1852 (St. 1852, p. 182, c. 108), declaring the stream navigable. In 1852 the water in the channel of the creek had a depth of 12 to 18 feet, and at one or two points, between narrow, well-defined banks, a depth of 24 feet. But westward of the mouth of the creek, or estuary, in the direction of San Francisco Bay, the water flowing out of the creek was dispersed over a large area, and the depth of water diminished until at the distance of about a mile from the entrance to the creek a bar had formed, over which no water flowed at extreme low tide, and less than 2 feet at ordinary low tide, through the narrow channel. This bar was a continuous shoal, extending from Oakland Point to Alameda Point, rendering navigation from the bay of San Francisco into the creek only possible to boats of light draft, and not to them at extreme low water. North of the narrow channel, where it crossed the bar, was a shoal, where, it appears, in early days passengers on boats stranded on the bar at low water might land, and walk ashore in a northerly and easterly direction to Oakland Point. This shoal is a usual formation on bars formed near the mouths of rivers and estuaries. Prof. Joseph Le Conte, in his Elements of Geology, speaking of the formation of bars at the mouths of rivers and estuaries, on page 30 says:

"The bar is formed by the contact of the river current with the still water of the ocean. It is most marked in the case of estuaries. The outflowing tide scours out the estuary, carrying with it sediment partly brought down by the river and partly the débris of land eroded by the inflowing tide. The larger portion of this is dropped as the tidal current comes in contact with the open sea and is checked by it. They are usually irregularly crescentric in form. Such are the bars at the mouths of all harbors."

The figure given to illustrate this paragraph resembles very closely the San Antonio creek or estuary, and the bar with its shoal island north of the channel. In the Bay of San Francisco the difference between ordinary high tide and ordinary low tide is about $4\frac{1}{2}$ feet, and the

difference between extreme high tide and extreme low tide is about 7 feet.

In 1852 it was a small settlement of less than 100 people on the north bank of this creek and a little more than a mile inland from its mouth that was incorporated by the Legislature as the town of Oakland. Water transportation between this settlement and San Francisco and other points on the opposite side of the bay was only practicable at that time by small boats through the channel of this creek. The construction of wharves on the bank of this stream for the convenience of the public and the preservation and improvement of the stream itself became, therefore, a matter of considerable importance to the rapidly increasing population of Oakland. The grant by the state of the lands lying within the corporate limits of the town between high tide and ship channel, for the purpose of facilitating the construction of wharves and the making of other improvements, resulted, as we have seen, in the construction of three wharves on the bank of the creek in front of the town by Carpentier, to whom the town transferred the lands, but no provision was made for improving the navigability of the stream on the bar. Plans were devised, however, by the people of Oakland for the work of deepening the channel at the bar, and some work accomplished in that direction. Cribbing was erected on the north shoal, and also on the south shoal, directly opposite. The purpose of these cribs was to confine the water of the channel to narrow limits, and, by the process of scouring, deepen the channel. There was also some state legislation in aid of the project, but finally, in response to an appeal made to Congress to take in hand the improvement of the harbor (Act March 3, 1873, c. 234, 17 Stat. 566), contained a provision for survey and examination of the creek by the engineers of the army, under the direction of the Secretary of War. Under this authority the board of engineers made an examination and survey, and reported a plan of improvement which included, first, the construction of two continuous training walls or jetties of rock, one on each side of the channel, commencing at the mouth of the creek or estuary, and extending out over the bar to the deep water of San Francisco Bay; and, second, the dredging of a channel between the jetties out to deep water. The plan also included the excavation of a tidal canal from the upper end of the estuary to San Leandro Bay, and the excavation of a tidal basin in the upper harbor. The plan was adopted, and in Act June 23, 1874, c. 457, 18 Stat. 242, an appropriation of $100,000 was made to carry the plan into effect. The plan appears to have been modified in some particulars, to meet new conditions as the work progressed. For the present purpose it is sufficient to notice the fact that the work which was commenced in 1874, and completed in 1892, resulted in two slightly converging high-tide jetties, extending from the shore line inside of the mouth of the creek to the navigable waters of the bay at the depth of twelve feet at low tide. The north jetty is 9,500 feet long. The south jetty is 12,000 feet long. The distance between the two jetties is 800 feet at the inner end, and 730 feet at the outer end. Between these two jetties a channel 300 feet wide and 20 feet deep has been dredged by the government from San Francisco Bay to Webster Street Bridge, a distance of 19,000 feet. The work

now in progress has for its object the dredging of a channel 300 feet wide, 25 feet deep, from the navigable waters of the bay to the foot of Fallon street, in the city of Oakland. The jetties are constructed of rock. They have an average width of 35 feet at the base, and an average width at the top or crest of 4 feet. The appropriations made by Congress from time to time in the successive river and harbor bills for this work, from June 23, 1874, to March 3, 1905, have amounted to $2,-800,600.

The north jetty, as at first constructed, commenced on the north bank of the creek near its mouth, at a point called "Sand Point," about where Cypress street, extended, reaches the bank of the creek, and from that point it extended westward. On May 3, 1878, the Oakland Water Front Company conveyed to the Central Pacific Railroad Company a tract of land having an area of 59 acres, with its southern boundary of 1,500 feet on the creek, commencing about 750 feet to the west of the point of commencement of the north jetty. The tract conveyed extended north above the line of ordinary high water, and had for its western boundary a line parallel to Peralta street, extended, and about 750 feet east of that line. The tract is known as the "Peralta Street Slip Tract." The southern boundary along the creek or estuary was described in the deed of conveyance as "along said northerly side of said public channel fifteen hundred feet," but the north jetty cut this tract of land off from the channel. The Central Pacific Railroad Company thereupon applied to the officers of the government to have the jetty removed from the front of this tract of land, and permission was given, upon condition that the material should be removed by the railroad company at its own expense, and used in the construction of a wall, commencing at a point where the western boundary of the Peralta Street Slip tract terminated on the bank of the creek, and extending in a northerly and easterly direction along the western boundary of the tract to the line of high tide, a distance of about 1,600 feet. The wall was accordingly removed, and rebuilt on the line designated. To the east of this wall the railroad company has dredged a basin of about 1,600 feet in length and 400 feet in width at the largest part, for holding piles, and to the north, on the upland, has erected creosote works for the purpose of creosoting the piles brought into the basin. The basin empties into the creek. The railroad company has also dredged and constructed a slip to the east of the basin just mentioned, and has established here a freight terminal for the transfer of freight cars between the Oakland side and San Francisco by boats, passing through the creek. This slip is known as the Peralta Street Slip.

In the early stages of the improvement of the Oakland Harbor, a question was raised as to the right of the United States to build its training walls upon the bed of the estuary. In the act of Congress approved June 18, 1878 (20 Stat. 155, c. 264), Congress suspended available appropriations for the improvement of this harbor until this question had been determined. In the act approved March 3, 1879 (20 Stat. 369, c. 181), available appropriations were not only suspended, but unexpended appropriations directed to be returned into the treasury, if by September 1, 1879, the right of the United States to the bed of the

estuary and training walls of the work be not secured free of expense to the government in a manner satisfactory to the Secretary of War. On July 12, 1879, the Oakland Water Front Company adopted a resolution containing the following provisions:

"That the right of the United States to the training walls of the work of the Oakland Harbor in all their extent, as now located and constructed, is hereby admitted and secured, free of expense, to the government, and all right and title of the Oakland Water Front Company to said training walls is hereby relinquished to the United States, *reserving the right of access to the channel and to cross said training walls with piers and wharves and also the right to construct slips, docks, and canals connecting with and opening into said channel, subject to regulation by the Secretary of War or the engineering department as to the manner thereof.*"

The boundary of the estuary and adjoining lands, the right to which was thus secured to the United States free of expense, was set out in the resolution. The boundaries on both sides of the channel begin in the Bay of San Francisco and extend landward. Notwithstanding this action on the part of the Oakland Water Front Company, Congress, in the act approved June 14, 1880 (21 Stat. 180, 192, c. 211), continued the suspension of available appropriations for the improvement of the harbor, by the following provision of the act:

"Improving Oakland Harbor, California, sixty thousand dollars; and the sums of money heretofore appropriated for this improvement and unexpended are hereby reappropriated, but the sums so appropriated and reappropriated shall not be available until the right of the United States to the bed of the estuary and training walls of this work is secured, free of expense to the government, in a manner satisfactory to the Secretary of War."

The Secretary of War thereupon referred the question to the Attorney General, who advised the Secretary of War that the United States had a legal right to use the bed of the estuary in question for the purpose of the proposed improvement, by the erection of training walls or any other appropriate structure, and that the owners of the soil could make no complaint of such use. 16 Op. Atty. Gen. 534. No reference was made by the Attorney General to the relinquishment by the Oakland Water Front Company of all right and title to the training walls and bed of the estuary and channel upon the condition of a right of access to the channel and to cross said training walls.

By the act of Congress approved August 11, 1888 (25 Stat. 400, 425, c. 860), Congress further exercised its supreme authority over the navigable waters of the United States by incorporating the following provision into the act:

"Where it is made manifest to the Secretary of War that the establishment of harbor lines is essential to the preservation and protection of harbors, he may, and is hereby, authorized to cause such lines to be established, beyond which no piers or wharves shall be extended or deposits made except under such regulations as may be prescribed from time to time by him."

Under this provision harbor lines on the eastern shore of San Francisco Bay in front of Oakland and Alameda were established by a board of engineer officers constituted by War Department special order No. 51, dated October 11, 1888. Pierhead and bulkhead lines were recommended by the board of engineers in a report dated October 3, 1893. The report was approved October 11, 1893. The pierhead

line is represented as corresponding substantially to the three-fathom line of the latest Coast Survey chart prior to that date, and the bulkhead line to the low-water line of the same chart, disregarding small bights, indentations, sinuosities, and projections, making the line uniform, with a uniform curve. The pierhead line, as thus established, so far as it is material to this case, runs from the western end of the north jetty to the end of Long Wharf, where that structure has been extended into deep water westward of the Oakland Mole. The bulkhead line crosses the north jetty at a point approximately 4,910 feet west of the western boundary of the Peralta Street Slip tract, and upon a slight curve outward passes from the north jetty to the Oakland Mole, crossing the latter at a point approximately 2,875 feet west of the shore line at ordinary high water, or otherwise designated as the "Peralta Grant Line."

On August 23, 1893, the city of Oakland brought suit in the superior court of Alameda county against the Oakland Water Front Company, to determine the adverse claim of the defendant to the land granted to the town of Oakland by the original act of incorporation passed May 4, 1852. At the time this suit was brought, the Central Pacific Railroad Company, by deed dated November 6, 1879, had succeeded to the title of the Oakland Water Front Company to the Oakland Mole and Long Wharf tract, extending out to the deep water of the Bay of San Francisco, containing an area of 319,626 acres. It had also, by deed dated May 3, 1878, succeeded to the title of the Oakland Water Front Company in the Peralta Street Slip tract, containing an area of 59 acres, with a frontage of 1,500 feet on the San Antonio creek, or estuary. It was also the owner of certain blocks of the upland between the shore end of the Oakland Mole and the Peralta Street Slip tract, the title to which it is not necessary to further identify for the purpose of this action. These tracts had been leased to the complainant, the Southern Pacific Company, by the lease dated February 17, 1885. Neither the Central Pacific Railroad Company or the Southern Pacific Company was made a party to the action.

The Oakland Water Front Company was the only party defendant, and it claimed title to all lands within the boundaries of the city of Oakland lying below the line of ordinary high tide of the Bay of San Francisco and the estuary of San Antonio and ship channel, except a parcel relinquished to the city of Oakland by the compromise agreement, and certain parcels which it had prior to that time conveyed to third parties, among others, the Oakland Mole and Long Wharf tract, and the Peralta Street Slip tract. The lands thus claimed by the company in that case included, among others, the area of submerged and partly submerged tide lands claimed by the complainant in this action as the guarantee of the Oakland Water Front Company.

Upon the trial of the case in the superior court a judgment was rendered in favor of the city of Oakland and against the water front company, and thereupon the defendant appealed to the Supreme Court of the state. The decision of that court was rendered September 13, 1897, and is reported in 118 Cal. 160, 50 Pac. 277. The case involved many of the questions relating to the title of the property

which have been presented to the court in the present case, and, as these questions pertain to local law relating to real estate, the decision of the Supreme Court will be followed by this court. United States v. Crosby, 7 Cranch, 115, 3 L. Ed. 287; Clark v. Graham, 6 Wheat. 577, 5 L. Ed. 334; McCormick v. Sullivant, 10 Wheat. 192, 6 L. Ed. 300; Jackson ex dem. St. John v. Chew, 12 Wheat. 153, 6 L. Ed. 583; Beauregard v. New Orleans, 18 How. 497, 15 L. Ed. 469; Suydam v. Williamson, 24 How. 427, 15 L. Ed. 978; McGoon v. Scales, 9 Wall. 23, 19 L. Ed. 545; Williams v. Kirtland, 13 Wall. 306, 20 L. Ed. 683; Walker v. State Harbor Commissioners, 17 Wall. 648, 21 L. Ed. 744; Brine v. Insurance Co., 96 U. S. 627, 24 L. Ed. 858; Barrett v. Holmes, 102 U. S. 651, 26 L. Ed. 291; St. Louis v. Rutz, 138 U. S. 226, 11 Sup. Ct. 337, 34 L. Ed. 941; Barden v. Land & R. Imp. Co., 157 U. S. 331, 15 Sup. Ct. 650, 39 L. Ed. 719. The main opinion of the court was written by Chief Justice Beatty, and was concurred in by Justice Temple and Justice Van Fleet. Justices McFarland and Garoutte concurred specially. Justices Harrison and Henshaw dissented. The main opinion, written by the Chief Justice, requires an extended notice, as it will be relied upon as practically disposing of all the questions in the present case. The title, based upon the several execution sales of the water front under judgment against the town of Oakland, was held by this opinion to be invalid, upon the ground that the lands in controversy were held subject to a public trust of laying out streets through them to and along the water front, and of using them as sites for wharves, docks, piers, and other essential aids to commerce, and to the traffic of a seaport town.

The contention of the defendant that the city of Oakland was estopped upon the question of title by the final judgment of dismissal in the case of Oakland v. Carpentier, 21 Cal. 667, was denied, on the ground that the dismissal in obedience to the mandate of the Supreme Court left the question of title in the grantee undetermined. It was held that the judgment in that case merely determined that there was no ground in equity for the relief asked for, and that if the grant was void the city could disregard it and assert its rights in any appropriate manner. It was therefore held that the judgment of dismissal was not res adjudicata upon the question of title, and did not estop the city to assert the void character of the grant in a subsequent action. The attempted transfer to Carpentier of the whole of the lands granted to the town for the purposes declared in the act of incorporation was declared to be absolutely void. The reason for this opinion is stated very clearly by the Chief Justice, in the following language:

"It ought not to require any very elaborate discussion in order to show that the attempted transfer to Carpentier of the whole of the lands granted to the town for the purposes declared in the act of incorporation was absolutely void. The power of the Legislature to make a grant of these lands to a natural person and the power of the municipal corporation to make the grant are two very different things. The corporation had no power to alienate these lands, unless such power was conferred by the Legislature, and whether it was conferred or not is a question of legislative intent, to be gathered from the terms of the statute construed with reference to its general scope and purpose. The purpose of this act was to create a municipal corporation composed of the inhabitants of a peninsula surrounded on three sides by the navigable

waters of the Bay of San Francisco. Considering the extent of territory included within the corporate boundaries, it is evident that a rapid growth of population was anticipated, and the situation of the town, with relation to the surrounding country and the most important harbor on the coast, no less than the express language of the title of the act, proves that one of the most important ends contemplated in the creation of the corporation was the improvement of commercial facilities by the erection of convenient wharves along its water front. To carry this principle and other minor purposes into effect, the municipal corporation was created and invested with a share of the sovereign political power to be exercised within the local boundaries. The trust thereby imposed upon the municipal government was public, and could neither be delegated nor abdicated. But by the proceedings above cited there was an attempt to do both by investing a private citizen with the exclusive right to erect wharves and regulate tolls. In this aspect of the ordinance it is confessedly void, but counsel for appellant strenuously contend that the grant of the land was valid, and rested upon a lawful and sufficient consideration. I do not think so. The ownership of the land was essential to the exercise of the power. That this was fully understood is shown, not only by the provisions of the charter, but by all the proceedings of the town trustees. At every step the two things went together, and in their very nature it is apparent that the one was necessarily bound up in the other. For how was it possible for the town to erect wharves after parting with its entire water front? It could only have done so by repurchasing the necessary sites, and it is not to be supposed that the Legislature intended so absurd a consequence. Undoubtedly it was the intention of the charter that the lands comprising the water front should be disposed of in some manner, but the manner of their disposition was to be considered with the purpose of the grant. The town council was invested with power, among other things, to lay out streets, and the plain intent of the law was that the streets of the town should be protected to the water front, the intervening spaces divided into blocks and lots and sold in subdivisions in such a manner as to preserve to the public ample means of access to the navigable waters of the bay and estuary, and to the municipal authorities ample space for the erection of wharves, piers, and docks. If any reasonable measures to this end had been taken, a sale of the lands by parcels would no doubt have been a proper exercise of power by the municipal authorities, but a transfer in bulk to a private citizen, without any reservation of the right of access to the navigable waters by which the town was almost completely surrounded, was a gross and evident excess of power.

"Counsel for appellant have referred us to the numerous decisions affirming the validity of sales of the beach and water lots of San Francisco, but there is not the slightest similarity between the two cases. The grant to San Francisco was of the lots platted upon a survey showing streets extending to and along the permanent water front of the city, and authority to sell the lots was expressly conferred and was subject to no condition, express or implied, except the return of a percentage of the proceeds to the state. There was no other trust connected with the grant. The right of access to the water front, and of sites for wharves, etc., was secured in advance by a dedication of the streets connecting the upland with the ship channel, and covering its whole length. No power of the corporation was in the slightest degree impaired, and no right of the public infringed, by the sale of the lots bounded by these public highways. What had been done in San Francisco was indeed an example and a guide to Oakland in disposing of her water front, and I do not doubt that it was in contemplation of the Legislature that substantially the same course should be pursued. Certain it is, at all events, that no such downright absurdity can be imputed to the Legislature as an intention to vest the council with authority to cut the town off from access to the water front by a transfer of the whole strip of shore lands at the same time that they were charged with the duty of erecting wharves, and when the construction of wharves was not only one of the declared purposes of the act, but was the express motive of the grant. My conclusion upon this point is the ordinances and deed of 1852–53, by which it was attempted to transfer the entire water front to Carpentier, were wholly void."

With respect to the title of the Water Front Company under the ratification and confirmation of the ordinances of the board of trustees of the town of Oakland, by section 12 of the act of May 15, 1861 (St. 1861, p. 387, c. 377), the opinion of the Chief Justice held that it was within the power of the Legislature to grant these lands to Carpentier, and the only question to be decided was whether that was the intention of the law. If such was the intention of the law, the Chief Justice was of the opinion that Carpentier had become vested with a perfect title, but he held that the law could not be so construed. His views upon this question are stated as follows:

"Up to this time Carpentier had no title, his asserted grant from the town being absolutely void, and therefore, if this amendment to the city charter had the effect of investing him with complete title, it was substantially a new grant by the Legislature. For it is to be remembered that the pretended grant by the town had been utterly repudiated by its successor, the city, which was at that very time endeavoring by its suit in equity to have its title to the water front judicially established. We are to suppose, then, that the Legislature intervened in this controversy, and, over the head of the city, transferred by its fiat the whole of the water front to a private citizen; and not only that, but that it conferred upon him the exclusive right for more than a quarter of a century to erect wharves, and regulate tolls and wharfage for a growing and ambitious city. For a confirmation of the ordinance of May 17, 1852, not only transferred the land in controversy, but sanctioned the abdication by the municipal authorities of their governmental functions in respect to wharves and tolls. Of course, it is impossible to suppose that the members of the Legislature actually intended to bring about this result, and the only question is whether they have used language which compels a construction to that effect. The argument of the appellant is that the language of the amendment necessarily includes all the ordinances of the town, and along with the rest the ordinances making and confirming the grant. In other words, the contention is that the word 'ordinances,' as here employed, is to be taken in its widest and most comprehensive sense. But there is a well-recognized rule of construction of statutes which requires the rejection of the broadest sense of a word, even when it is its most natural and usual sense, if that is necessary in order to give effect to the true intent of the law, or to prevent a result at variance with its apparent purpose. The word 'ordinance,' however, in its usual primary sense, means a local law—a rule of conduct prospective in its operation, and applying generally to the persons and things subject to the local jurisdiction. It does not, in its ordinary use or signification, include a grant of lands. Conceding it to be true that a grant of lands may be made by municipal ordinance, it is equally true that the idea of such a grant is not suggested by the use of the word, and this because it is a very unusual mode of granting lands. It is to be presumed, therefore, that in this instance the Legislature used the word in its ordinary and restricted sense, rather than in a sense which would bring about a result at variance with the purposes evinced by other portions of the act. The title to the act, and its declared purpose, was to amend the charter of the city of Oakland, and it did make some trifling amendments really germane to the subject. As an amendment it became part and parcel of the charter—which, like the original charter of the town, conferred the power and imposed the duty upon the municipal authorities to construct wharves and regulate tolls. Can it be supposed, then, that by the general words of this amendment the Legislature intended to deprive the city of the means of executing the powers imposed upon it, or that it intended to make a grant to a private citizen without a precedent in the previous legislation of the state, and without a parallel in its subsequent legislation? While it is true that the Legislature had the power to make the grant, they will not be held to have made it unless their intention so to do has been clearly manifested, and here certainly such an intention is more than dubious. There was nothing in the title of the act to suggest the idea of a grant to Carpentier, and such a grant was in no degree germane to

the avowed purpose of the act. On the contrary, it was, as we have seen, at variance with some of the most important provisions of the charter. For these reasons I conclude that the amendment ratifying and confirming the ordinances of the town of Oakland must be held to apply exclusively to ordinances properly so called—that is, to the local laws of the town, and not to ordinances which were mere grants or attempted grants of the lands of the corporation—to ordinances adopted in pursuance of the legislative authority of the council, and not to ordinances which were in effect mere conveyances or attempted conveyances of the property interest of the town in its water front lands."

Justice McFarland was of the opinion that the title to the land in contest passed to the grantor of the water front company before the compromise of 1868—at least, by the confirmatory legislative act of 1861. Justice Garoutte was of the opinion that the confirmation and ratification of the ordinance of the town of Oakland by the act of May 15, 1861, made the grant to Carpentier a legislative grant, and such grant for all purposes stood as a direct grant to him by the state. As the dissenting opinion of Justices Harrison and Henshaw did not touch this question, it remained undecided by a majority of the court.

With respect to the compromise proceedings of 1868, the Chief Justice was of the opinion that they were valid and effective, and passed the title to the water front as provided in such compromise. His views upon this question are stated as follows:

"In the year 1867, the authorities of Oakland again began to stir in the matter. A contract was made, or proposed, by which an attorney was retained for the purpose of recovering for the city the water front lands and the rights connected therewith. But before the commencement of any action or other proceeding for that purpose, a compromise of the claims of the city was proposed and accepted. At that time the transcontinental railroad was approaching completion, and the Western Pacific Railroad Company, which owned the franchise from Sacramento to San Jose, was projecting a branch line to a point on the bay at or near San Francisco. In order to induce that company to make its terminus at Oakland, Carpentier offered them a portion of the water front claimed by him. They, however, had no confidence in the validity of his claim, and refused to consider his proposition unless the necessary steps should be taken to clear up his title. The whole matter was then submitted to the city authorities and their attorney, with the result that a compromise was agreed upon and subsequently carried out. The substance of this agreement was that the city should procure from the Legislature the necessary authority to make the compromise that a small portion of the water front should go to the city, and the rest be divided between the Oakland Water Front Company—a corporation of which Carpentier was the principal stockholder—and the railroad company. The principal consideration to the city, and its principal share in the compromise, was the establishment of the railroad terminus at the city front and the expenditure of $500,000 in the erection of depots and other terminal works. In pursuance of an understanding to this effect, application was made to the Legislature, and an act was passed March 21, 1868 (St. 1867–68, p. 222, c. 230)."

The opinion quotes the act, the contracts entered into between the parties in interest, and the ordinances of the city of Oakland in execution of the terms of the compromise, all of which have been set out in full in a previous part of this opinion. The opinion of the Chief Justice concludes as follows:

"I am utterly unable to see any reason for denying the efficacy of this compromise. By the very terms of the act the council, with the concurrence of the mayor, was authorized to compromise, settle, and adjust any and all con-

troversies in which the said city was interested. This is very different from the paraphrase 'its controversies,' which counsel for respondent use in their argument. There is some plausibility in the contention that authority merely to compromise 'its controversies' would not enable the city to alienate property held subject to a public trust, but authority to compromise, settle, and adjust any controversy in which it was interested, conferred by the same power that created the trust, is certainly comprehensive enough to sustain a transfer of the property subject to the trust. Nor is there anything in the suggestion that there was no existing controversy with Carpentier to be compromised. If ever there was a flagrant and notorious controversy over anything, there was certainly such a controversy between Carpentier and the city of Oakland over this water front, and it was none the less a controversy because on the 21st of March, 1868, there was no action or legal proceeding actually pending in court. As to the alleged unreasonableness of the compromise, it can only be said to have been unreasonable in the sense that the city gave up too much and kept too little. But what the city should exact, or concede, in making the compromise, was a matter confided to the discretion of the mayor and council, and, in the absence of fraud, their judgment is conclusive.

"The conclusion, I think, necessarily follows, that from and after the 2d day of April, 1868, the city of Oakland ceased to be the owner as trustee, or otherwise, of any portion of her water front, except those portions secured to her by the compromise of that date, and such streets, thoroughfares, and other parcels as may have been previously dedicated to public use. As to all such places the transfer to the Water Front Company and its assigns was subject to the public easement, and the city as trustee for the public is no doubt entitled to a decree in this action, defining her right of control over the lands so dedicated. With respect to such streets and public places, the various consent decrees, relied upon by defendant, constitute no estoppel, and the statute of limitations does not apply."

Justices McFarland and Garoutte being of the opinion that the title to the water front had passed to the grantor of the Water Front Company prior to the compromise of 1868, and the opinion of Justices Harrison and Henshaw not touching that question, it follows, that a majority of the court did not concur in the opinion that the compromise of 1868 was effective to vest the title to the land in controversy in the Water Front Company, but five judges did agree that the title of the City of Oakland to the lands had been transferred and had become vested in the Water Front Company; two judges holding that such transfer became effective and valid under the confirmatory act of the Legislature of May 15, 1861, and three judges holding that such transfer was made under the compromise act of March 21, 1868. This conclusion rendered it unnecessary for the court to consider the effect of the judgment in favor of the defendant in the superior court of Alameda county in the case of City of Oakland v. Oakland Water Front Company entered February 7, 1882.

The extent of this grant was the next and most important question discussed by the Chief Justice in his opinion, and is the controlling question now before the court in the present case. It does not appear to have been a subject of serious controversy between the parties to that action, for both parties contended for a construction that would give to the winning party the greatest amount of land. This contention attracted the attention of the court, and led to a very careful and elaborate discussion of the question. The preliminary statement indicates how the question arose, and the necessity for its determination. The court says:

"As the findings and decree of the superior court, as well as a principal part of the argument of counsel for respondent, are based upon a certain assumption as to the size and location of the grant, it becomes a point of capital importance to determine at the outset whether that assumption is well founded, for if it shall appear that it is based upon a radical misconstruction of the act of incorporation, and that the grant is really of much less extent than has been so assumed, it must necessarily follow that the conclusions of the superior court, and the argument based upon them, will be to some extent invalidated. In determining this point we shall not be greatly assisted by the labors of counsel, for, since both parties are contending for the land granted, each is naturally interested in maintaining a construction of the grant which will give it the widest possible extent. It is true that at the hearing of this appeal counsel for defendant, for the purpose of avoiding the force of the argument based upon the supposed inordinate extent of the grant to Carpentier, suggested, rather than contended, that perhaps the grant did not embrace so much of the submerged land on the bay front of the city as the superior court and counsel for the plaintiff have assumed. They did not, however frankly and unequivocally take that position, and the concessions they seemed inclined to make do not include all that is required by any consistent construction of the act of incorporation.

"As to the plaintiff, its interests, of course, demand that it should contend for the most liberal construction of the grant; for the greater its extent the stronger is the argument founded on the doctrine of the Chicago case (Illinois Central R. R. v. Illinois, 146 U. S. 387, 13 Sup. Ct. 110, 36 L. Ed. 1018) against the validity of its alleged transfer to a natural person or private corporation, and the greater the prize to be obtained by the success of the argument. Naturally, therefore, we find counsel for plaintiff confidently asserting as a matter beyond controversy that the grant to the town of Oakland embraced the whole of the estuary of San Antonio, including what is now called the Eastern or Brooklyn Basin, up to the line of high water mark on all sides of that inlet, and that it extended out into the Bay of San Francisco to the three or four fathom line at low tide, containing in all 8,000 acres of land spreading out like a fan on the bay front, and covering at its outer edge more than the entire frontage of Oakland and Alameda. I find myself constrained to dissent radically from this view, and since the settlement of this question at the outset is essential to a proper discussion of the case, I shall here state my own construction of the grant, with the reasons upon which it is founded."

The court refers to the description of the lands granted as contained in section 3 of the original act of incorporation passed May 4, 1852 (St. 1852, p. 181, c. 107). The description is as follows:

"The lands lying within the limits aforesaid [i. e., the corporate limits of the town as defined in the first section of the act] between high tide and ship channel."

The corporate limits of the town as set forth in the first section of the act is referred to in the opinion for a further description of the grant, and particularly with respect to the eastern and southerly boundary of the town of Oakland along San Antonio creek. An attempt appears to have been made to enlarge the grant by changing this boundary for the city of Oakland. In the act of May 4, 1852, the boundary of the *town* of Oakland was "thence down the *southerly line of said creek or slough* to its mouth in the bay." In the act of May 15, 1861, this boundary for the *city* of Oakland was enlarged by the following description:

"Thence along the eastern and southern *highest tide line of said slough* and of the estuary of San Antonio, following all the meanderings thereof to the mouth of the said estuary in the Bay of San Francisco."

In the act of April 24, 1862, this boundary was again enlarged by the following description:

"Thence along the eastern and southern *highest tide line* of said slough and of the estuary of San Antonio, following all the meanderings thereof to the mouth of the said estuary in the Bay of San Francisco."

In the opinion of the court this extension of the municipal limits of the city of Oakland had no retroactive effect upon the property rights of the city or of her grantees which were to be determined by the proper judicial construction of the act of 1852, regardless of any subsequent change in the city limits, and that a proper construction of that act was that the southerly line of the San Antonio creek or estuary was the line of low tide. ' One of the reasons given for this construction of the act of 1852 was the fact that it contained a gratuitous grant of land, and if there was any ambiguity or uncertainty in the act, that construction must be placed upon it which was most favorable to the state. Another reason was that without reference to the gratuitous donation of lands contained in the grant, the state acts for the public good, and all its grants, including the grant of municipal franchises, were to be construed in a manner most conducive to the general welfare.

The next term of description contained in the boundary of the grant which required construction was "ship channel" and the question was, what was meant by the Legislature in the use of this term? Before proceeding with the opinion of the Chief Justice upon this question, it will not be out of place to notice some of the evidence before the court having relation to this question. The court had before it the compromise agreement of April 1, 1868, between the Oakland Water Front Company, the Western Pacific Railroad Company, the City of Oakland, Horace W. Carpentier, John B. Felton, and Leland Stanford, wherein it was agreed, among other things, that the Western Pacific Railroad Company would, with all reasonable diligence and within three months, select from the Oakland water front lands 500 acres in one or two parcels, in designated shapes, but not so as to include an aggregate frontage on *ship channel* exceeding one-half mile in length, with rights of way from high-water mark to such parcels not more than 100 feet wide at grade. This selection was to be subject to the condition that if said parcels, or either of them, should be located out to a *westerly water front of 24 feet depth of water at low tide,* no land should be sold westerly therefrom, and no obstructions or impediment should ever be placed or put in front or westerly of the same, or anything done to prevent the free and unobstructed approach of vessels to said parcels. The selections were made by the Western Pacific Railroad Company as provided in the agreement, and the deeds of conveyance executed by the Oakland Water Front Company, one to the Western Pacific Railroad Company, dated July 27, 1870, and the other to the Central Pacific Railroad Company, dated November 6, 1879, contained the same conditions as the compromise agreement with respect to the location of the parcels of land out to a *westerly water front of at least 24 feet of water at low tide,* and the deeds contained a covenant against a sale of lands westerly therefrom, and against the placing of obstructions or impediments in front thereof. As appears from these deeds,

one of the parcels of land so selected was the present Oakland Mole and Long Wharf, *extending out to a depth of 24 feet of water at low tide, or the four-fathom line,* as shown on the charts of the United States Coast and Geodetic Survey.

The court also had before it the provision of the compromise agreement requiring the Oakland Water Front Company to designate and dedicate as a navigable water course for public use the channel of San Antonio creek *from ship channel* to the town of San Antonio to a width of not less than 200 feet *over the shallow water at the bar and 300 feet wide above that place.* The court also had before it the pierhead line running from the western extremity of the north jetty to the Oakland Pier or Long Wharf, following substantially the *three-fathom line,* as shown on the charts of the United States Coast and Geodetic Survey at that time. This pierhead line was established by the Secretary of War upon the recommendation of a board of United States engineers, dated October 3, 1893, based upon a survey and examination made under the authority of section 12 of the act of August 11, 1888 (25 Stat. 425, c. 860), providing for the establishment of harbor lines essential to the preservation and protection of harbors. The court also had before it the bulkhead line established at the same time by the Secretary of War upon the recommendation of the same board of engineers, and under the same statutory authority. This line crossed the north jetty at a point about 4,910 feet west of the western boundary of the Peralta Street Slip tract, and, following substantially the *line of ordinary low water* as it existed at that time, crossed the Oakland Mole about 2,875 feet west of the shore line at ordinary high water.

With these harbor lines before the court, the question was whether "ship channel" was to be considered the water-front line over the shallow water at the bar at *four fathoms of water,* adopted by the compromise agreement of 1868 for the Oakland Wharf, the compromise having been authorized by an act of Legislature, or whether it was to be considered as the *three-fathom* or *pierhead line* of 1893, adopted by the Secretary of War under the authority of a statute of the United States, or whether it was *bulkhead* or *low-water line* of 1893, adopted at the same time and by the same authority? What was the decision of the court upon this question, and how did it reach it? The opinion of the court answers both questions better than it can be stated in briefer language. The court says:

"What did the Legislature mean by 'ship channel'? It has been assumed that they meant the three-fathom line or the four-fathom line of the bay. But this assumption, which pervades the entire argument of counsel for the city, and seems to have guided the defendant in all its dealings with the subject of the controversy for a long series of years, has, so far as I can discover, no tangible basis. It is certain some meaning must be ascribed to the term 'ship channel' in order to give effect to the act, and it must be some precise and definite meaning; for the law abhors want of definition in matters of boundary as nature abhors a vacuum. Especially is this true with respect to the boundaries of a municipal corporation invested with power and authority to make and enforce local laws, civil and criminal. It is not to be supposed that the Legislature, in conferring the municipal franchise upon the inhabitants of a local district, will purposely leave its boundaries in any respect uncertain. On the contrary, it must be assumed that the intention was to mark the boundary so exactly and definitely that no question could

arise as to whether a particular spot was within or without the local juris-
diction. It is true this presumption of a precise and definite intention on
the part of the Legislature in the enactment of laws is often opposed to the
actual fact. It frequently happens that the framers of a law have no well-
defined idea of what they desire to accomplish or no capacity to give ex-
pression to their ideas. In such cases the difficult task is imposed upon the
courts of discovering a meaning that never existed. Such, I think, is really
the case here. The act under consideration is in many respects confused, in-
coherent, and ambiguous. In the case of Oakland v. Carpentier, 13 Cal. 550,
Baldwin, J., in the course of his opinion, refers to it in these terms: 'The
charter is, perhaps, the most defective upon the statute book, and this is say-
ing a great deal. A perverse ingenuity seems to have been exercised to make
it as lame and loose as possible. The joint labors of Malaprop and Partington
could scarcely have been such a collocation or dislocation of words and sen-
tences.' But, in spite of the possibility that the framer of the law did not him-
self know what he intended, and the certainty that if he had a definite idea he
has failed to give it definite expression, we must hold that 'ship channel' was a
line capable of location on the ground, and must determine where it ran.
That it was a line different from the line of high tide is rendered certain by
the fact that the land granted is described as lying between the line of high
tide and ship channel, but beyond this it cannot be said anything is certain.
A witness in the case (Allardt) testified that he should consider the 18-foot (3-
fathom) line at low tide the boundary of ship channel; but he was testifying
more than 40 years after the enactment of the law, and there is nothing to
show that prior to its passage the words 'ship channel' in that collocation had
ever acquired, by general or local usage or by legal enactment, any such mean-
ing. The channel of a river, strait, or bay, in the technical sense of the term,
means the deeper part, which can be most safely navigated; but in this sense
it cannot imply any fixed depth of water, for it is entirely relative to the par-
ticular river, strait, or bay to which reference is made, and the deepest portion
of one body of water may be shallow compared to the channel of another.
And in the same body of water the channel for vessels of lighter draft would
generally be more extensive than the channel for vessels of heavier draft,
as it certainly is in front of Oakland. Ship channel, therefore—in this sense
of the word 'channel'—had no definite boundaries in the Bay of San Fran-
cisco at the date of the passage of the act, and it is a purely arbitrary as-
sumption to say that the 3-fathom line was intended. It could be said with
exactly as much plausibility that the Legislature meant the 4-fathom line or
the 2-fathom line.

"But perhaps some light may be thrown upon this question by a considera-
tion of previous acts in which the expression 'ship channel' occurs. Indeed,
it would seem entirely reasonable to suppose that in two acts of the same Leg-
islature it was used on each occasion to signify the same thing. By the act of
April 21, 1851, entitled 'An act providing for the disposition of certain proper-
ty' (St. 1851, p. 305, c. 37), there was granted to the town of Martinez a strip
of tide land a half mile in length in front of the town, the outer boundary
of which was 'the line of ordinary ship's channel.' The act, however, affords
no clue to the meaning of these words, though it does very clearly evince the
intention of the Legislature that the land granted should be surveyed, sub-
divided, platted, and sold, and the proceeds used for the general improvement
of the town, and particularly for the benefit of commerce by the construction
of wharves, piers, docks, etc.

By the act of March 26, 1851, to provide for the disposition of the 'beach
and water lots' of San Francisco (St. 1851, p. 307, c. 41), a permanent
water front of the city was established. The boundary of this water front
was traced along the outer edge of the outermost streets as delineated on
the map of a survey that had been previously made of the city front, and
which extended beyond the line of low tide a considerable distance out
into the bay and to deep water. The survey terminated, however, at the
intersection of the northern line of Jefferson street with the western line
of Larkin street, and to define the water front from that point to the
western boundary of the city it was provided that it should follow 'the
line of ship channel.' Now here we have an indication of the meaning

of the term. The water front established by law and ship's channel are co-terminous. The line to which the city may extend its streets, and within which it may sell lots and authorize the purchasers to fill them up and occupy them, is water front. Immediately beyond is ship channel, and it includes all the space between the piers and wharves which by the act of May 1, 1851 (St. 1851, p. 311, c. 44), the city was authorized to extend from the end of every street terminating at the water front 200 yards out into the channel.

"This meaning of the law seems to me to be a fair deduction from the fact that the point at the northwest corner of Jefferson and Larkin streets is at the same time on the line of ship channel and on that of water front. If the lines are coincident at one point, they must be coincident throughout as far as the survey extends, and from the end of the survey to the western limits of the city the line of ship channel is nothing more or less than the line to be fixed by the completion of the survey and legal establishment of the balance of the water front. I conclude, therefore, that the term 'ship channel,' as used in this earlier act relating to San Francisco, was intended to include all the navigable waters of the bay outside of what may be termed the bulkhead line as established by law."

The court thereupon concludes that "ship channel," as used in the grant of the Oakland water front, comprised the waters "left free to navigation," and that such waters were bounded by the line of low tide. This part of the opinion of the Chief Justice was concurred in by Mr. Justice McFarland, who said:

"I concur in the judgment of reversal, and in the conclusion reached in the opinion of the Chief Justice, that the grant involved in this case, and the lands claimed by the Water Front Company, *is limited by the line of low tide on the westerly side, and on the estuary,* and with respect to all other boundaries by the lines designated in said opinion."

Mr. Justice Garoutte, concurring, said:

"I concur in the judgment of reversal. *The grant in this case should be confined within the smallest limits possible.* The state should have the benefit of all doubtful constructions in matter of description, and for this reason the westerly line of the grant should be established at the point of low tide. In this respect I agree with the conclusion of the Chief Justice."

The question now arises, what did the court mean by the use of the term, "line of low tide," and how did it locate the southern and western boundaries of the grant with this line? Did it mean the line of low tide on May 4, 1852, the date of the grant, or the line of low tide at any time when it became necessary to determine the fact? The defendants contend that the court held that the grant was bounded by the low tide as it existed on the 4th day of May, 1852, and in support of this contention reference is made to that part of the opinion of the court to be found on page 180 of 118 Cal., page 284 of 50 Pac. The court, as a result of its effort to find a meaning for the term "ship channel," has arrived at the conclusion that it "comprises the water left free to navigation," but the court was further required to locate its boundaries with precision, and, as no artificial boundary has been established by competent authority, the court was driven to seek a definite natural boundary, if any such could be found, and it found such a boundary at the "line of low tide." "This," says the court, "is a definite line, and the only definite line beyond the line of high tide, and my conclusion is that the line of low tide *as it existed on the 4th day of May, 1852, was the western boundary of the town of Oakland intended by the original act of incorporation.*" This language certainly does seem to point

to the line of low tide as it existed on May 4, 1852, as the western boundary of the grant; but the complainant contends, in effect, that the court simply determined that the term "ship channel," as used in the act of May 4, 1852, was the line of low tide at that time, and that low tide has continued from that time to the present to be at once "ship channel" and the western boundary of the grant, wherever the line of low tide may be. In other words, as a boundary line to the grant, "ship channel," or its equivalent, the line of low tide is not a fixed or permanent line, but movable, following the changes that may have taken place from time to time in the receding line of low tide on the shore of the bay. In my opinion it is not necessary to determine this question in this case. It will be sufficient for the purpose of the present controversy to determine what the actual boundaries of the grant were on the south and west as described in the act of May 4, 1852.

This brings us to the second question: How did the court locate the southern and western boundary of the grant with this line, the line of low tide? This is the description of those boundaries, as contained in section 1 of the act of May 4, 1852:

"Thence down the southerly line of said creek or slough to its mouth in the bay; thence to ship channel; thence northerly and easterly by the line of ship channel to a point where the same bisects the said northeastern boundary line."

The court had already determined that "down the southerly line of said creek or slough" was the line of low tide. It had also found a definite natural boundary at the line of low tide for the western boundary, but it suggests a possible objection to this line arising out of the terms of the act, namely, that it is inconsistent with the implication of an interval between the mouth of the estuary and ship channel contained in the words, "thence to ship channel." This objection would, of course, be based upon the supposition that the mouth of the creek or slough, *in the bay,* and the mouth of the channel at the bar, were not one and the same thing. This objection, as we shall see, is without foundation. But we will proceed with the court's answer to the objection:

"Of course, if we assume that the southern shore of the estuary at low-water mark is the southern boundary of the town, and the eastern shore of the bay at low-water mark is ship channel, there can be no interval between the mouth of the estuary and ship channel, and the words 'thence to ship channel' must be rejected as superfluous. This, of course, would not be allowable, if the whole description could be reconciled upon definite lines. But, in fact, it cannot be; for, in addition to the impossibility of finding any definite line in the bay beyond low-water mark, there is another important and specific call in the description that must be rejected if we adopt the three-fathom line, or any other line of uniform depth in the bay that could be suggested. The call for the western boundary is 'thence northerly and easterly by the line of ship channel to a point where the same bisects the said northern boundary line.' But the three-fathom line does not run northerly and easterly. It runs throughout its whole extent in a uniform northwesterly direction; whereas, the line of low tide, from the mouth of the estuary at low tide (this point is marked by the intersection of the United States government bulkhead line with the jetty walls) exactly fulfills this call in the description; that is, its course is northerly and easterly, a circumstance sufficient in itself to counterbalance the force of the words, 'thence to ship channel,' in the previous call."

We have here a positive identification of the point of departure for the last call of the description, namely, commencing at the point "marked by the intersection of the United States government bulkhead line with the jetty walls," thence northerly and easterly by the line of ship channel (the line of low tide) to a point where the same bisects the northeastern boundary line. This is unquestionably the bulkhead line of 1893, following substantially the line of low tide at that time, and answering with precision the last call of the description contained in the act of May 4, 1852, and, what is equally important, following substantially the line of low tide on the bar from the shoal north of the channel in a northerly and easterly direction, as shown by the evidence and the charts of the Coast and Geodetic Survey from 1856 to the time of the construction of the north jetty. Moreover, the compromise agreement of 1868, which, having been authorized by the Legislature of the state, has been deemed an agreement to which the state was a party, located "ship channel *over the shallow water at the bar.*" But, as the court rejected the call "thence to ship channel" as superfluous, because the southern shore of the estuary at low-water mark and the eastern shore of the bay at low-water mark were points of conjunction at "ship channel," it may be said that the southerly line of the estuary as a boundary terminated at the mouth of the estuary at the point where the waters of the channel emerged from between the shores of the upland, and that the court, omitting the call "thence to ship channel," fixed the point of departure for the last call of the boundary at the mouth of the estuary as thus described, but immediately opposite on the northern side of the channel. There are a number of insuperable objections to this construction of the opinion of the court. In the first place the court located the mouth of the estuary *at the bar,* and this it did in express language. On page 182 of 118 Cal., page 285 of 50 Pac., when speaking of the northern branch of the estuary and its navigability as compared with the eastern branch, the court says:

"Each branch had a depth of two feet at low tide—the same as the *depth on the bar at the mouth of the estuary.*"

Moreover, the court was dealing with a line along navigable waters. It has said that ship channel comprises the waters left free to navigation, and it has found that the line of low tide is a definite natural boundary for such waters. Now a boundary line terminating at the mouth of the estuary between points of the upland has not got over the *shallow water at the bar,* and it has not yet reached ship channel *in the bay* or the navigable waters of the bay, and it must do that to answer the call of the description, and it must do it following down the south side of the channel before it can turn and take a course in a "northerly and easterly" direction. In other words, there must be a meeting of the navigable waters of the estuary with the navigable waters of the bay on the south side of the channel before the boundary line has fulfilled its call, and can turn and follow the line of navigable waters of the bay in a "northerly and easterly" direction; and, further, if the last call of the boundary starts from the mouth of the estuary between the banks of the upland, its course would be around the water

front of the main land in a northerly and *westerly* direction, instead of a northerly and *easterly* direction, as required by statute, which, we have seen, was the objection of the court to the three-fathom line; and, besides, such a line, following the sinuosities of a low-tide line, would not be on the boundary of ship channel or the navigable waters of the bay; and, finally, that the court did not intend to fix the point of departure for the last call of the description at the mouth of the estuary where the waters of the channel pass the shores of the upland, but at the point where the waters of the channel empty into the navigable waters of the bay, is conclusively determined by the fact that the court fixed that point at the intersection of the United States bulkhead line with the jetty walls, from which point the direction of the last call northerly and easterly is fulfilled. It follows that what the court meant by rejecting the call, "thence to ship channel," was the fact that the description, "down the southerly line of said creek or slough to its mouth *in the bay.*" was sufficient. This line carried the boundary over the shallow water at the bar to ship channel, or, what is the same thing, to the navigable waters of the bay, and the direction "thence to ship channel" was superfluous.

The complainant claims to be the owner of the land between the north training wall on the south, the Peralta Street Slip tract and the line of high tide on the east, the Oakland Mole on the north, and the United States bulkhead line on the west. The land involved in this case is within the boundaries of the tract just described, but it is of less extent, being immediately adjacent to the north training wall extending from the western boundary of the Peralta Street Slip tract to the United States bulkhead line, with a width of about 600 feet on the east end, and gradually enlarging in width at the west until it is 1,000 feet wide. This strip of land is part of two larger tracts conveyed to the complainant by the Oakland Water Front Company. The first is marked No. 1 on the plat inserted in this opinion. The deed is dated October 31, 1892, was acknowledged April 5, 1893, and was recorded October 19, 1893. The second tract is marked No. 2 on the same plat. The deed is dated January 8, 1903, was acknowledged on that date, and recorded January 21, 1903. These dates indicate that the first deed was recorded, and the second deed executed and recorded, after the suit in the case of City of Oakland v. Oakland Water Front Company, 118 Cal. 179, 50 Pac. 277, was commenced, on August 26, 1893. The complainant was therefore not made a party to that action. As before stated, complainant's grantor was the only defendant in that action.

It appears that as early as 1852, and down to a recent date, there has been a strip of land north of the line where the north training wall is now located, below the line of low tide, and that it is that strip of land the defendant, the Western Pacific Railway Company, has entered upon and now holds and claims by right of possession against the claim of ownership asserted by the complainant. The evidence shows that the north training wall was in fact laid along a line below the line of low tide from its original starting point inside the mouth of the estuary at Sand Point to the large shoal at the bar, and from this shoal to the

extreme western end of the jetty in the navigable waters of the bay. There may be some question as to whether this was the fact with respect to the line of the wall from Sand Point to the western boundary of the Peralta Street Slip tract; but there is no question that from the Peralta Street Slip to the large shoal at the bar, and from the shoal to the western end of the jetty, this was the fact. The charts of the United States Coast and Geodetic Survey issued from time to time from 1856 to 1893 show that the line of the north jetty was below the line of low tide, and the fact is established beyond question by the "Lewis Map of 1875" and the "Progress Survey Map of 1881," attached to the affidavit of L. J. Le Conte, the assistant United States engineer in charge of Oakland Harbor since October, 1875. The line of low tide north of the line of the north jetty had a sinuous course over the flat in a northwesterly direction; but, as I construe the opinion of the Supreme Court, this line of low tide is immaterial in this case. It was in no sense a boundary line of the town of Oakland or of the grant to Carpentier. That line, as we have seen, was drawn along the south side of the estuary and channel to the navigable waters of the bay, and the grant extended across the estuary and channel to that line. In 1879 the Oakland Water Front Company, by formal resolution, admitted the right of the United States to the training walls of the Oakland Harbor in all their extent as then located and constructed, and all right and title of the company to the training walls was relinquished to the United States, reserving, however, the right of access to the channel and to cross said training walls with piers and wharves, and also the right to construct slips, docks, and canals connecting with and opening into said channel, subject to the regulations by the Secretary of War or the Engineering Department as to the manner thereof. The right of the United States to the bed of the estuary and adjoining lands, or so much thereof as should finally be included within the plan of the harbor and taken and used by the United States, was admitted and secured for that purpose, free from expense to the government, within certain boundaries, described as conforming to Col. Mendell's map or design of improvement of Oakland Harbor, California, dated September 30, 1873.

The resolution of the water front company further provided that the grants and relinquishments contained in the resolution were made upon the precedent condition that the right of the United States to the bed of the estuary and training walls should be found to be secured in a manner satisfactory to the Secretary of War, within the meaning of the act of Congress in that behalf, so as to make available the appropriations "for improving Oakland Harbor" according to the terms and conditions thereof. It appears, however, from the opinion of the Attorney General (16 Op. Atty. Gen. 534), that the Secretary of War was advised that the constitutional power of Congress to regulate commerce, a power which included that of regulating and improving navigable waters, gave to the United States a right which was deemed sufficient in the case of the Oakland Harbor to use the bed and shore of the estuary for the purposes of the proposed improvement by erecting training walls or any other appropriate structure thereon, and that the proprietor of

the soil could make no complaint of such use. In other words, the United States declined to accept the relinquishment of right and title of the water front company to the bed of the estuary and its shores upon any conditions, relying upon its own sovereign right and authority, under the Constitution, for a more comprehensive title and a better right to make the proposed improvement. This determination has limited the boundary of the grant to the town of Oakland and its grantees on the north side of the north jetty to the line of the foot of the jetty wall, and this is the line of complainant's title along the north jetty from the Peralta Street Slip to the intersecting line of the United States bulkhead established in 1893. The western boundary, as described in the grant and defined by the Supreme Court, is the line of low tide forming the natural definite boundary of the navigable waters of the bay, which corresponds substantially in location and direction with the United States bulkhead line established in 1893 by the War Department under the authority of section 12 of the act of August 12, 1888 (25 Stat. 425, c. 860), fixing the low-tide line marking the boundary of the navigable waters on the eastern shore of the bay of San Francisco. These southern and western boundaries having been determined by the Supreme Court of the state to be in accordance with the terms of the original grant by the state to the town of Oakland, the decision is binding upon this court. Shiveley v. Bowlby, 152 U. S. 1, 57, 14 Sup. Ct. 548, 38 L. Ed. 331; Lowndes v. Huntington, 153 U. S. 1, 18, 14 Sup. Ct. 758, 38 L. Ed. 615; Walker v. State Harbor Commissioners, 17 Wall. 648, 21 L. Ed. 744.

If it be said that the question of the boundaries of the grant was not within the issues of the case before the court, and that the opinion of the court upon this question was therefore dictum, a sufficient answer will be found in the opinion itself. The city of Oakland brought the suit against the Oakland Water Front Company to declare the water front grant void upon the charge that it had been made in violation of a public trust as defined by the Supreme Court of the United States in Illinois Central Railroad v. Illinois, 146 U. S. 387, 13 Sup. Ct. 110, 36 L. Ed. 1018. The decision was rendered December 5, 1892. The suit against the Water Front Company was filed by the city of Oakland August 26, 1893. Its purpose was to secure an adjudication upon that question, and in support of the claim that the grant was void under the doctrine of the Illinois case, the city of Oakland contended that the grant embraced, as the Supreme Court said, "the whole of the estuary of San Antonio, including what is now called the eastern or Brooklyn basin up to the line of high-water mark on all sides of that inlet and that it extended into the Bay of San Francisco to the three or four-fathom line at low tide, containing in all 8,000 acres of land, spreading out like a fan on the bay front, and covering at its outer edge more than the entire frontage of Oakland and Alameda." Manifestly, the question of the boundary of this grant was in issue, and it was only by ascertaining that its boundary was much less than that claimed by the plaintiff that the grant escaped the charge that it was a substantial impairment of the interest of the public in the navigable waters of the bay and estuary. The court found, in effect, that the grant did not include public navigable waters, or prevent the

144 F.—13

use of such waters for the purposes of commerce and navigation, and that the lands included within the properly described boundaries of the grant were of a character that might be held in private ownership for the erection of wharves, docks, and piers in aid of commerce and navigation.

The next question to be considered relates to the rights of the parties to this controversy in a strip of land lying immediately adjacent to the north side of the north jetty and west of the United States bulkhead line. It is the western end of the long strip of land claimed by the Western Pacific Railway Company as being naturally below the line of low tide, and therefore not within the grant of the Act of May 4, 1852; but, being west of the bulkhead line, and between that line and the pierhead line, it presents a different question from that involved in the strip of shore land to the east of the bulkhead line and between that line and the line of high tide. This western end of the strip of land in controversy is 1,000 feet in width and more than 2,500 feet in length. It is marked "Bulkheads, A, B," on the plat inserted in this opinion. To the extent of its width of 1,000 feet it lies between the shore land just determined to be the property of the complainant and the public navigable waters of the Bay of San Francisco at the pierhead line. The complainant does not claim title to this particular tract in fee simple, but it is alleged in the bill of complaint that the shore lands of the complainant have comparatively little value, and cannot be made fully available for any useful purpose, without free access to the pierhead line by proper construction so as to connect the same with the navigable waters of the bay; but with such access and the lands used for wharves, slips, yards, switches, shops, freight warehouses, and the like, in connection with and as part of the terminal facilities for transcontinental railway operation, they are of great value. It is further alleged that if the lands shall be cut off by the defendants from the navigable waters of the Bay of San Francisco, their value will be in a large part destroyed, and the complainant irreparably damaged.

The evidence before the court shows that since the year 1903 parties acting for and on behalf of the defendant, the American Dredging Company, have been engaged in excavating material from the bed of the Oakland channel and from the mouth of the channel in San Francisco Bay, and have deposited this dredged material upon the northerly side of the north jetty, and for the purpose of retaining the material in place, they have constructed a bulkhead, commencing at or near the west end of the north jetty, and running thence perpendicularly to said jetty, northerly about 1,000 feet, and thence at right angles a second bulkhead running easterly toward the shore and toward and across the United States bulkhead or low-tide line, and parallel to the said north jetty the distance of about 3,000 feet. The construction of these two bulkheads and the impounding of the dredged material between their walls and the wall of the north jetty have been by the permission of the United States engineers having in charge the work of improving the Oakland Harbor and channel, but largely at the expense of the defendant, the Western Pacific Railway Company. This last fact appears, however, to have been unknown to the complainant until recently. The purpose of the Western Pacific Railway Company in causing this

strip of land to be filled up was to bring the surface of the ground above the water, and then appropriate or occupy the ground for a foundation upon which to place ties and rails for the terminal tracks of a projected line of railway which it is now engaged in building from Salt Lake, in the state of Utah, to the navigable waters of the Bay of San Francisco. As part of this projected railway the Western Pacific Railway Company has secured a tract of land in the city of Oakland, lying a short distance easterly from the easterly boundary of complainant's lands; and it is alleged that it intends to construct a pier adjacent to and upon the north side of the north jetty from a point about 3,700 feet easterly of the point where the United States bulkhead line intersects said north jetty to a point immediately northerly of the present westerly end of the north jetty, and to construct at the end of said pier wharves, slips, and landing places, where ferryboats, steamships, and other craft plying upon San Francisco Bay and upon the Pacific Ocean may land and embark and discharge passengers and freight, and to connect this pier with its property in the city of Oakland east of complainant's property by a line of railway tracks, and for the purpose of making such connection it has commenced proceedings in court to condemn a right of way for its line of tracks from its Oakland property to the easterly end of the land to be occupied by the projected pier. But it is not alleged that proceedings have been commenced to condemn a right of way through complainant's shore land for the location of defendant's projected pier from its eastern end to the United States bulkhead line, a distance of about 3,700 feet. On the contrary, the complainant alleges in its bill of complaint that no such proceedings have been commenced.

This strip of submerged land between the bulkhead line and the pierhead line is land belonging to the state under the navigable waters of the bay, which has not been granted in private ownership. "The grant to Oakland was of the lands lying between high-water mark and ship channel (the line of low tide), * * * and therefore included nothing west of the line of low tide on the bay front." Oakland v. Oakland Water Front Co., supra. But the act of May 4, 1852, incorporating the town of Oakland, authorized the board of trustees by ordinance to construct, make, open, widen, regulate, and keep in repair wharves, docks, piers, and slips, and with a view to facilitate the construction of wharves and other improvements, the lands lying within the limits of the town between high tide and ship channel (the line of low tide) were granted and released to the town, and it was provided that said lands should be retained by the town as common property or disposed of for the purposes mentioned in the statute. This act, as we have seen, did not grant any land to the town beyond ship channel, which, as has been determined, was the line of low tide. This was a boundary line, and was therefore the limit of the municipal jurisdiction, and beyond it in the direction of deep water (or what is now the pierhead line) the town had no authority to construct wharves, docks, or piers, or regulate their business as property or franchises. The ordinances of the town passed in pursuance of the act and the deed of conveyance to Carpentier were all limited in express terms to this bound-

ary. This grant was sufficient for all the purposes of water front improvements mentioned in the statute, so far as it related to the harbor of the estuary, as the boundary along the estuary was on the south side, and the Oakland water front was on the north side. Wharves, piers, and docks could therefore be built out on the Oakland side to deep water, and still be within the limits of the grant. The only limitation on such structures in the direction of the channel from the Oakland side was the general law incorporated into one of the ordinances that they should not obstruct navigation.

But with respect to the boundary on the west side of the town fronting on the bay the situation was altogether different, and the definition of "ship channel" given by the Supreme Court would seem to cut off the very right for which the grant was made. There the line of low tide is on the landward margin of the bay, and the construction of wharves, piers, and docks within the boundary of such a line would not be in aid of navigation or for any other useful purpose. Such structures, running out no further than the line of low tide would not reach water of sufficient depth, even at high tide, to make them available as landing places of any value for commercial purposes. "Water of sufficient depth to float vessels is an essential part of every wharf, a necessary incident thereof, or appurtenance thereto, without which there can be no wharf and no wharfage. Indeed, a wharf cannot be defined or conceived, except in connection with adjacent navigable water." Langdon v. Mayor, 93 N. Y. 129, 151. But the Supreme Court of this state evidently did not mean by its definition of "ship channel" in the Water Front Case to cut off all the rights of the grantee at the line of low tide, for in another place in the opinion the court said:

"No such downright absurdity can be imputed to the Legislature as an intention to vest the council with authority to cut the town off from access to the water front by a transfer of the whole strip of shore land at the same time that they were charged with the duty of erecting wharves, and when the construction of wharves was not only one of the declared purposes of the act, but was the express motive of the grant."

The question now arises, under what right can wharves, piers, and docks be built along this Oakland water front on the west from the bulkhead line out to the navigable waters of the bay? The right must exist somewhere, for the navigable waters of the bay constitute a public highway to which the large commerce of a terminal point like Oakland must have access. The defendant the Western Pacific Railway Company claims the right for itself under a law of the state and provisions of the Oakland charter adopted in 1889. The complainant, assuming that the grant might be construed as limited to a line of low tide different from that adopted in this opinion, has claimed the right for that corporation, under the law of accretions and as a riparian owner entitled to wharf out to deep water, and also as an easement appurtenant to the granted land.

The claim of right contended for by the Western Pacific Railway Company is based upon Section 470 of the Civil Code, which provides as follows:

"No railroad corporation must use any street, alley, or highway, or any land or water within any incorporated city or town, unless the right to so use the same is granted by a two-thirds vote of the town or city authority from which the right must emanate."

This section is claimed to be an implied grant by the state to the incorporated city or town of the land under navigable waters within the municipal boundaries for railroad purposes. The provision of the Oakland charter relative to rights of way for railroad companies or corporations over the streets of the city to and from the water front, with the right to construct and maintain wharves, docks, and other terminal facilities, is found in subsections 29 and 30 of section 31, art. 3 of the freeholders' charter, approved by the Legislature on April 14, 1889. Subsection 29 is as follows:

"It shall be the duty of the council, and the council is hereby required, to grant to any railroad company or corporation applying therefor, a franchise to lay and maintain tracks along any line selected by the applicant, and to pass with steam railroads along, upon, and across, or elevated above or placed below, any street or streets within that portion of the city which lies [then follows a description of a section which it is said includes the land in controversy]. And the council shall, upon said portion of the city, grant equal privileges, subject to the general laws of the state of California, to all railroad companies or corporations to enter the city and operate and maintain railroads for the convenience of the public to and upon the water front of the city; and shall grant to such companies or corporations, without discrimination between them, the right to construct and maintain freight and passenger depots, engine-houses, workshops, wharves, docks, slips, ferries, landing-places, and other terminal facilities, provided that no franchises for right of way exceeding fifty feet in width and no franchise for terminal facilities upon land exceeding one thousand feet of frontage on the water front shall be granted to any one company or corporation, or to any companies or corporations under one management or control."

Subsection 30 provides as follows:

"The council shall, upon the portion of the city designated in the preceding subdivision of this section, grant, subject to general laws, to all companies or corporations desiring to acquire, or condemn property for public uses, equal privileges to construct and maintain wharves, docks, slips, landing-places, ferries, warehouses, and other property devoted to public uses, but not upon land exceeding one thousand feet of frontage upon the water front to any one company or corporation, or to any companies or corporations under one management or control."

St. 1889, pp. 513, 527, 528, c. 3.

The charter was adopted by a two-thirds vote of the qualified electors of the city. It will be observed that the statute of the state and the provisions of the charter cited refer to the granting of rights and privileges in the streets and water front of the city; that is to say, the streets and the water within the municipal boundaries. By reference to section 5 of article 1 of the charter, we find the boundaries of the city carefully described by courses and distances, and, among others, the boundaries on the south and west of the city, as follows:

"Thence westerly following the center of the slough and the center of the estuary of San Antonio to ship channel in the Bay of San Francisco; thence northerly and westerly along ship channel to its intersection," etc.

The only difference between these two boundaries of the city and the corresponding boundaries of the town of Oakland described in the act ·

of May 4, 1852, is that the first-named boundary follows "the center of the slough and the center of the estuary of San Antonio to ship channel in the Bay of San Francisco," instead of "down the southerly line of said creek or slough to its mouth in the bay at ship channel," as provided in the original act. The difference between the southerly line of the estuary and its center is immaterial in this controversy. The point of departure for the second call of the description remains the same at ship channel, and continues thence along ship channel. The course along ship channel has been changed from northerly and *easterly* to northerly and *westerly,* following one of the enlarged boundaries of the city of Oakland contained in the act of April 14, 1862, which the Supreme Court held did not extend the boundaries of the grant, and, of course, does not change the boundary for the tract of land in controversy. Its boundary on the west continues to be ship channel, and "ship channel" must mean the same thing in the charter that it did in the act of May 4, 1852, namely, the line of low tide. It follows that the strip of land now under consideration is not within the boundary of the city of Oakland and therefore not subject to the provisions of section 470 of the Civil Code or the provisions of the city Charter to which reference has been made.

The law of accretions need not be discussed. It has no reference to the line of low tide, which has been adopted, in this opinion, as the boundary of the grant defined by the Supreme Court in the Water Front Case. The remaining claims of the complainant as a riparian owner, or, to speak more accurately, the claims of the littoral proprietor, cannot, in my opinion, be admitted under the law of this state to the full extent contended for by the complainant.

The question arose at an early day in this state whether the owners of lots upon the water front of San Francisco, as established by the act of March 26, 1851 (St. 1851, p. 307, c. 41), were riparian owners, and as such entitled to wharf out in front of their premises. Section 4 of this act, referring to the line of the water front boundary, provided that it "shall be and remain a permanent water front of said city, the authorities of which shall keep clear and free from all obstructions whatever the space beyond said line to the distance of five hundred yards therefrom." In the sixth section it was provided as follows:

"Nothing in this act shall be construed as a surrender by the state of its right to regulate the construction of wharves or other improvements, so that they shall not interfere with the shipping and commercial interests of the bay and harbor of San Francisco."

In Dana v. Jackson Street Wharf Co., 31 Cal. 118, 89 Am. Dec. 164, the claim of the owner of a water lot to wharf out in front of his premises was denied. The court said:

"We do not consider that the plaintiff is a *riparian* proprietor in the sense in which that term is used in the law of tide waters. He is not an owner upon the 'shore,' but upon a 'water front' of statute creation. The water front established by the act of March 26, 1851, is what that act has made it to be, and the rights of the plaintiff as the owner of a beach and water lot abutting upon it exist only in subordination to that act. It is provided in the fourth section of the act that the boundary line described in the first section 'shall be and remain a permanent water front of said city,' and special provision is made for keeping it free and clear of all obstructions. If the water front

could be extended on the ground of marine increase by reliction or alluvion, or by any other kind of accretion, so that the owner of the water lot immediately adjacent would have a right of entry thereon to the exclusion of the state, then the water front, as limited by the red line of the act, would or might be an ever-shifting, instead of a permanent, line. There is another reason why rights incident to ownership upon the shore of navigable waters cannot be considered as incident to ownership upon the 'water front' in the harbor of San Francisco. 'Shore' is the space between high and low water mark. Against the plaintiff's water lot there is no such space. The water front at that point is below low-water mark, and there can be no riparian right to build a wharf or pier beyond it; and it follows that, if a wharf should be built by a stranger below the line of low water, the owner of the adjacent upland would have no right of entry upon it on which he could maintain ejectment. Dutton et al. v. Strong, 1 Black, 23, 17 L. Ed. 29."

The act of March 26, 1851, in establishing a water-front boundary for the city of San Francisco, had necessarily cut off and extinguished the right of the riparian or littoral owner to wharf out in front of his premises. The right of the state and the right of the lot owner to construct wharves and other water-front improvements on the same frontage could not exist together, and the right of the lot owner had to yield to the superior authority of the state.

On the 24th of April, 1863, the Legislature of California passed an act creating a board of state harbor commissioners, and requiring that they should take possession of and hold all that portion of the Bay of San Francisco lying along the water front of said city and adjacent thereto, to the distance of 600 feet into the waters of the bay from the line of the water front as defined by the act of March 26, 1851. The commissioners were authorized to construct a sea wall and such wharves, piers, landings, and thoroughfares as the wants of commerce might require, and generally to have control of the water front and improvements for the purpose of providing for the accommodation of the commerce of the port.

In Weber v. Harbor Commissioners, 18 Wall. 57, 21 L. Ed. 798, the owners of certain other lots lying along the water front built a platform along and adjoining the water front the whole length of the lots, and had constructed a wharf projecting from the center of the platform into the bay. The owners of this wharf and their successors continued in the uninterrupted possession of the wharf, and collected tolls and wharfage for its use until the state harbor commissioners, acting under the authority of an act of the Legislature, caused piling and capping and planking to be so placed on both sides of the wharf as to prevent any approach to it by vessels. The owner of the wharf brought suit to have the erections made by the harbor commissioners declared to be a nuisance. He contended that he was a riparian proprietor, and that the establishment of the permanent water front of San Francisco by the act of March 26, 1851, was a contract between the public and the owners of the property, or those who should afterwards purchase under the grant to the city, and could not be changed, except by the assertion of the rights of eminent domain, and that obstructions could not be authorized without compensation. The court held that he was not a riparian proprietor having a right to wharf out into the bay. The court said:

"In this case no inquiry as to the rights of a riparian proprietor, by either the common law or local usage or regulation, is needed. The complainant is not the proprietor of any land bordering on the *shore* of the sea, in any proper sense of that term. His land is situated nearly half a mile from what was the shore of the Bay of San Francisco at the time California was admitted into the Union, and over it the water at the lowest tide then flowed at a depth sufficient to float vessels of ordinary size. Although the title to the soil under the tide waters of the bay was acquired by the United States by cession from Mexico, equally with the title to the upland, they held it only in trust for the future state. Upon the admission of California into the Union upon equal footing with the original states, absolute property in, and dominion and sovereignty over, all soils under the tide waters within her limits passed to the state, with the consequent right to dispose of the title to any part of said soils in such manner as she might deem proper, subject only to the paramount right of navigation over the waters, so far as such navigation might be required by the necessities of commerce with foreign nations or among the several states, the regulation of which was vested in the general government."

The court then refers to the legislation of the state disposing of portions of the lands covered by the tide waters of the bay in front of the city of San Francisco and the act authorizing the city of San Francisco to construct wharves at the end of all the streets commencing with the bay, the wharves to be made by extending the streets into the bay for a distance not exceeding 200 yards beyond the outside line of the beach and water lots; this line being established as the permanent water front of the city. The act also provided that the space between the wharves, where extended, should remain free from obstructions, and be used as public slips for the accommodation and benefit of the general commerce of the city and state. The court continued:

"It was after the passage of these acts that the predecessors of the complainant acquired all the title to the lots which he holds; and they took whatever interest they obtained in subordination to the control by the city over the space immediately beyond the line of the water front, and the right of the state to regulate the construction of wharves and other improvements. There is, therefore, no just foundation for the claim by the complainant as a riparian proprietor of a right to wharf out into the bay in front of his land. He holds, as his predecessors took the premises, freed from any such appendant right. The erection of his wharf, the obstruction to the use of which is the cause of the present suit, was, therefore, not only an intereference with the rightful control of the city over the space occupied by it, but was an encroachment upon the soil of the state which she could remove at pleasure. Having the power of removal, she could, without regard to the existence of the wharf, authorize improvements in the harbor by the construction of which the use of the wharf would necessarily be destroyed."

The statutes of the state involved in these two cases fixed a permanent boundary line for the water front of San Francisco, and disposed of the land within such boundaries to private parties. These statutes finally provided that the state should take possession of the water front, construct a sea wall along an extended boundary, and build wharves, piers, and landing places for the benefit of commerce and navigation. The state accordingly took possession of the water front and proceeded to execute the public trust as the owner of the land under the navigable waters of the bay, and it did this free from any claim of right on the part of the water lot owner to have access to the navigable waters of the bay. The harbor lines of San Francisco were established by the

state. The harbor lines of Oakland have been established by the United States. The water front of Oakland below the line of low tide is as much the property of the state as the land under the water on the San Francisco side of the bay, but the state has not dealt with it in precisely the same way. Both grants of the shore lands were made to municipal corporations. The grant to San Francisco was shore land, extending out to deep water. This boundary line of deep water was coterminous with ship channel. Oakland v. Oakland Water Front Co., 118 Cal. 179, 50 Pac. 277. The grant to Oakland was also shore land, extending out to a line described as ship channel, which as a boundary line was held by the Supreme Court to be the line of low tide. Both municipal corporations conveyed these shore lands to private parties. But the grant of the water lots to the city of San Francisco carried with it no right to construct wharves, piers, or docks on the granted premises. This right was expressly reserved to the state, while in the grant to the town of Oakland the right was expressly given, and was to be exercised by the grantee for the benefit of commerce and navigation. Whether this right be called a riparian right, or a right pertaining to the grant as an easement, is immaterial in this case. It will have the same scope and be subject to the same limitations in either case. But if the owner of land below the line of low tide has this right, that it must be derived from the statute, is, I think, supported by abundant authority. In addition to the two cases cited from this state adverse to the claim under the right of riparian ownership, there are authorities in several states to the same effect. The opinion of the court in the case of Turner v. People's Ferry Company (C. C.) 21 Fed. 90, 93–95, states the proposition clearly with respect to a similar question concerning the rights of water lot owners in New York harbor. The court says:

"As I have before said, none of the premises occupied by the complainant were any part of the original shore. They were a part of the harbor of the city of New York, and far below even low-water mark. Riparian rights do not attach, as a matter of course, to a grant of such lands under tide water. A right of wharfage in such cases, as an incorporeal hereditament, must be derived either from the express terms of the grant, as in Langdon v. Mayor, etc., 93 N. Y. 129, 150, and in Marshall v. Guion, 11 N. Y. 461, or from the clear and manifest intent of the grant, as shown by the surrounding circumstances, such as prior use, or the declared intention of the grant. Langdon v. Mayor, 93 N. Y. 129, 144; Voorhees v. Burchard, 55 N. Y. 98; Huttemeier v. Albro, 18 N. Y. 48. In the absence of an express grant of wharfage, or of such manifest intention, the city or the state, as the case may be, may make successive grants of its lands under water, each in front of the former, to different grantees, without any violation of the rights of either; and neither the first nor the last grantee will acquire any exclusive riparian privileges. None of such grantees are in any proper sense riparian owners at all, and riparian rights do not attach to such grants. Weber v. Harbor Com'rs, 18 Wall. 57, 67, 21 L. Ed. 798. In this state, where the common law on this subject prevails, and the state is owner of the soil below high-water mark, it was long since settled that a grant of such lands, even with a right to erect a wharf expressed in the grant, was by implication of law not an exclusive grant of wharfage rights, but that such rights, so long as they were not wholly cut off, were subject to be modified and abridged through other grants and other harbor regulations for the public benefit, without compensation. * * * The federal decisions are in accord, therefore, with those of this state, so far as respects riparian rights attaching to grants of land under water in harbors or along navigable rivers. I find no case where any such exclusive rights are

recognized, unless they are derived from the state or the city in express terms, or else by necessary implication from the circumstances of the grant."

The declared intention of the grant of the state to the town of Oakland was to authorize the construction of wharves, docks, piers, slips, and to make other improvements. The grant of the fee on the boundary of the navigable waters was limited to the line of low tide. This line on the bay front would defeat the purpose of the grant, unless access to the navigable waters of the bay may be had over the strip of land belonging to the state between these two lines. Under such circumstances, the right must be presumed to have been in contemplation of the Legislature as appurtenant to the grant, subject, however, to the subsequently declared policy of the state as expressly stated in section 2 of article 15 of the Constitution of the state of 1879, relating to harbor frontage, etc., where it is provided that:

"No individual, partnership, or corporation, claiming or possessing the frontage or tidal lands of a harbor, bay, inlet, estuary, or other navigable water in this state, shall be permitted to exclude the right of way to such water whenever it is required for any public purpose, nor to destroy or obstruct the free navigation of such water; and the Legislature shall enact such laws as will give the most liberal construction to this provision, so that access to the navigable waters of this state shall be always attainable for the people thereof."

The right is subject, also, to the power of the state to make such regulations and provide for such improvements as the public interests may require for the promotion of commerce and navigation. It may be urged that, even with this qualified right of access to the navigable waters of the bay, the complainant, owning the shore, may exercise its right in such a way as to exclude the defendant from reaching such waters with its transcontinental road. This objection has been repeatedly answered by the courts in other states and was answered by the Supreme Court in the Water Front Case. It was there said, on page 185 of 118 Cal., page 286 of 50 Pac.:

"It is true that the private ownership of the shore may prevent access to the navigable waters of the bay, but so does the private ownership of the upland prevent access to the shore and to the navigable waters in the same sense and to the same extent. This, however, is a minor and temporary inconvenience for which our laws and the laws of all civilized states provide an ample remedy. By the exercise of the right of eminent domain all necessary means of access from the uplands to the water front may be condemned for the public use, at a cost not in excess of the reasonable value of the land taken or subjected to the servitude. And there is no injustice in requiring this compensation to be made to the grantee of shore lands when his right to such lands is in other respects valid in law; for, like other holders of title derived from the state, he is presumed to have given what, at the time of the grant, was deemed a fair equivalent for the land granted."

If the Western Pacific Railway Company is otherwise entitled to reach the navigable waters of the Bay of San Francisco, the shore lands of the complainant need not be considered a permanent obstacle at this terminal point.

The defendants have interposed the objection that the bill of complaint does not state facts sufficient to bring the case within the equitable jurisdiction of the court. This objection cannot be sustained. The title to the Oakland water front has been in litigation for more

than 50 years. It has been finally adjudicated and determined by the highest court of the state. The complainant brings that title into court, and by proper averments asks that its right of ownership and possession under that title shall be protected against irreparable injury. This is clearly a cause of equitable jurisdiction and requires no further discussion. The acts of the defendant, the American Dredging Company, have no bearing upon the title or the right of possession in this case. Its operations are being carried on under a contract with the government, represented by the United States engineers. The dredged material is being deposited north of the jetty wall by permission of the engineers. These operations cannot prejudice the rights of either party to the suit, and I doubt if an injunction would lie against work carried on under these conditions. Congress has the constitutional power to regulate and improve the harbors and navigable waters of the United States, and this power carries with it the right to deposit the material removed in making the improvements in any other part of the harbor or navigable waters or other place within its control. 22 Op. Atty. Gen. p. 646. But, further than this, it appears that the deposit of the dredged material upon the land in controversy will be a benefit to the land for the purpose for which it will be used, whichever party may be finally successful. The complainant will therefore suffer no damage by the operations of the dredging company in filling in below the line of low tide. The order of this court dated January 30, 1906, modifying the original restraining order, will therefore continue in force until the further order of the court.

An injunction pendente lite will issue in accordance with the prayer of the bill of complaint, in the substantial terms of the present restraining order, as modified by the order of January 30, 1906. The order to show cause issued upon the cross-bill will be discharged, and the temporary restraining order dissolved.

Mr. Olney: If your honor please, the opinion is a very long one, and the leading counsel for the Western Pacific are not in California. I therefore ask for a stay of proceedings until such time as your honor's opinion can be examined and some conclusion arrived at as to what ought to be done under the circumstances. No harm can inure to the complainant in this case if a stay of proceedings is granted.

Mr. Dunne: How much of a stay do you want, Mr. Olney?

Mr. Olney: We are allowed, under the statute, 30 days to take an appeal. We should like to have, and give you notice now, that as soon as the appeal is perfected, if we perfect one, we shall ask the court to suspend proceedings until it has heard from the Circuit Court of Appeals. The statute provides that may be done, and the statute provides that cases like these have precedence.

The Court: There will be no trouble about having it disposed of in 6 weeks in the Court of Appeals.

Mr. Olney: If we take our appeal, as probably we shall, the case will be disposed of very quickly by that court, and finally disposed of. In the meanwhile, it seems to me it is only right that the interests of all parties shall be protected and remain as they are until the final disposition of the most important question that has been before the court for a long while.

Mr. Dunne: I do not meet that request with any unfriendly disposition, but suggest that a 5 days' stay be granted, with leave to counsel to apply for an extension, so that we may have a reasonable opportunity to confer with the operative and administrative departments of the Southern Pacific. My disposition is favorable to anything reasonable. I therefore ask that counsel take a stay now of 5 days, with leave to apply for an extension.

The Court: The case, in my judgment, is very important. The issues involved are of consequence, not only to the parties concerned, but to the people of the state. I think, therefore, there should be a stay of sufficient time to enable the parties to fully understand the questions determined by the court. I think I would be authorized, under the decisions that have been rendered by the Circuit Court in other circuits, to grant a reasonable stay. I believe it was done in the case of Hovey v. McDonald, 109 U. S. 150, 161, 3 Sup. Ct. 136, 27 L. Ed. 888.

Mr. Dunne: It was done in the case of Cotting v. Kansas City Stockyards Co. (C. C.) 82 Fed. 851, 857.

The Court: It has been done in a number of cases. I therefore feel disposed to grant the application for a reasonable time. I understand that the parties will proceed without delay and with all haste to get the case before the appellate court.

Mr. Slack: There will be no doubt about that, if it is determined to take the case there. I understand we have 30 days in which to appeal after the entry of the order granting the injunction, but in the meantime we will, as Mr. Olney has suggested, desire to confer with the leading counsel who have participated in the case on behalf of the Western Pacific Railway.

The Court: I can suspend the entry of the interlocutory decree. The case may be allowed to remain just as it is for 10 days.

Mr. Dunne: We would prefer to have the interlocutory decree entered, and that a reasonable stay be granted, because the time for an appeal does not become concurrent until the entry of the order. We would very much prefer to have the order entered, and that a reasonable stay of proceedings be granted.

Mr. McEnerney: I suggest, so that we may know exactly the situation, that we take a stay that carries us over next Monday, say an 8 or 10-day stay, as Mr. Dunne's suggestion that the order ought to be entered, appeals to me.

The Court: You will take 10 days.

Mr. McEnerney: Yes.

The Court: The entry of the interlocutory decree will be suspended for 10 days. At that time the decree will be entered and such further proceedings taken as are satisfactory. That will be the order.